<hr/>

JULIAN HOLMES *vs.* TURNER'S FALLS COMPANY & another.

Franklin.   September 18, 1889. — January 4, 1890.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Auditor — Rule in Real Action — Agent of Corporation — Declarations — Adverse Possession — Disseisin — Mortgage Sale — Assignment — Exceptions.*

An auditor may, under the Pub. Sts. c. 159, § 51, be appointed in any civil action at law.

In a writ of entry to recover a parcel of land, after the tenant had pleaded *nul disseisin* and filed a claim for an allowance for improvements, the Superior Court referred the case to an auditor, and issued a rule directing him " to examine the claims and vouchers, and hear the parties thereon, and make a report thereof to the court." *Held*, that that court had power to appoint the auditor, and that the rule covered all the claims of the parties, including the matter of a disputed boundary.

Objections not specifically called to the attention of the court at the trial cannot be considered upon a bill of exceptions.

The president of a corporation, authorized to sell and lease its lands, and, with its treasurer, to execute deeds of the same, is impliedly authorized to point out the boundary lines thereof; and his declarations relative thereto made while negotiating a lease near to and in sight of the land, as well as those of the treasurer, made at the same time in the president's presence and hearing, and without his

dissent, are admissible in evidence against the corporation, and, after their decease, against its subsequent grantees.

If a lessee, under the belief that he is occupying only the demised premises, occupies land beyond the boundaries thereof, which the lessor never had possession of, nor claimed title to, nor included in the lease, the lessee's possession is not that of the lessor, so that it will constitute a disseisin of the land by the latter.

A disseisin of a mortgagee by a mortgagor or by those claiming under him, cannot occur until it is made known to the mortgagee that the mortgagor or his grantees make some claim adverse to his title.

The assignee of a mortgage as "collateral security" may, as against the mortgagor and those claiming under him, execute a power of sale contained in a mortgage as fully as if the assignment had been absolute.

Several distinct parcels of land included in a mortgage may be sold at one sale to separate purchasers.

WRIT OF ENTRY, dated March 3, 1883, against the Turner's Falls Company and the Turner's Falls Lumber Company. Plea, *nul disseisin*, with a claim for an allowance for improvements. After the former decision, reported 142 Mass. 590, the case was tried in the Superior Court, before *Hammond*, J., who, after a verdict for the demandant, allowed a bill of exceptions, which appear in the opinion.

*A. De Wolf*, for the Turner's Falls Company.

*D. W. Bond*, for the Turner's Falls Lumber Company.

*G. D. Robinson & F. G. Fessenden*, (*S. T. Field* with them,) for the plaintiff.

FIELD, J. Since the enactment of the Revised Statutes, the demandant in a writ of entry is entitled to recover rents and profits, although damages therefor are not specifically claimed in the writ; and the tenant, if he make the claim, is entitled to an allowance for improvements; and the amount of both these claims may be assessed by a jury. Pub. Sts. c. 173, §§ 12–35. *Raymond* v. *Andrews*, 6 Cush. 265.

On December 1, 1886, the Superior Court referred the present cause to an auditor. The rule recites, that it appears upon an examination of the issue, that the trial of said action will require an investigation of accounts and an examination of vouchers by the jury, and therefore the court appoints "Edward E. Lyman of Greenfield, in said county, an auditor to examine the claims and vouchers, and hear the parties thereon and make report thereof to the court. And if either of the parties shall neglect to appear before the auditor, after due notice given of

the time and place appointed for hearing them, the auditor may proceed *ex parte*."

When this rule was entered, the tenants had pleaded *nul disseisin*, and had filed a claim for an allowance for improvements. Pending the hearing before the auditor, the parties filed an agreement in writing, " that all questions concerning rents and profits and the value of improvements by the tenants should be postponed till after the trial of the question of title, to be determined by an assessor." The hearing proceeded, and the auditor subsequently made and filed his report, in which he found that both tenants had disseised the demandant of a portion of the demanded premises, which he defined by metes and bounds. The demandant at the trial offered this report in evidence. The tenants objected to its admission on two grounds; first, that " there is no authority to appoint an auditor in a real action," and secondly, that " the matter of the division line was not included in the reference to the auditor." The bill of exceptions then states that, " it appearing to the court that no exception had been taken to the order referring the case to an auditor, and that all parties had appeared before the auditor and proceeded to a full hearing, and no objection was made till the report was offered in evidence, the court admitted the auditor's report. The tenants excepted."

It may be that it was competent for the court to find, on the facts which appeared, that the parties had consented that the cause should be referred to an auditor with the usual powers; and that a reference of a cause to an auditor by consent of parties may be made, as well as a reference to an arbitrator or a referee; and that it was too late for the tenants to take this objection when they made it, even if the court had no authority to appoint an auditor in a real action. See *Kimball* v. *First Baptist Society in Amesbury*, 2 Gray, 517. We prefer, however, to consider the principal question.

The history of the practice of referring causes to auditors was examined in *Holmes* v. *Hunt*, 122 Mass. 505, and in *Locke* v. *Bennett*, 7 Cush. 445. The first statute on the subject was the St. of 1817, c. 142, and it is entitled " An Act for facilitating Trials in Civil Causes." It provided that " Whenever, in any action before the Supreme Judicial Court, or any Circuit or

other Court of Common Pleas, it shall appear to said courts
that an investigation of accounts or an examination of vouchers
is necessary for the purposes of justice between the parties, it
shall be lawful for the said courts to appoint an auditor or
auditors to state the accounts between the parties, and to make
report thereof to the court as soon as may be," etc.

The first statute authorizing the appointment of masters in
chancery was the St. of 1827, c. 109, § 4.  *Lyman* v. *Warren*,
12 Mass. 412, decided in 1815, was an action of debt on a pro-
bate bond, in which the defendant confessed a forfeiture, and
" prayed to be heard in chancery " on the amount for which
execution should issue; and the court, with the consent of the
parties, appointed three persons as auditors " to examine and
take and state the accounts in the action."  The opinion in-
dicates that the appointment of auditors in such a suit was not
unknown in practice at that time, although there was no statute
authorizing either the appointment of auditors or masters in
chancery.

The phraseology of the St. of 1817, c. 142, shows that it was
the intention of the Legislature to authorize the courts named
in the act to appoint an auditor or auditors in any civil action
in which " an investigation of accounts or an examination of
vouchers " was necessary.  The Rev. Sts. c. 96, §§ 25–31, were
a re-enactment of the St. of 1817, c. 142, " with the addition of
some practical details, but without any material change," as the
Commissioners say in their Report.  Section 25 of chapter 96
of the Revised Statutes provided that, " whenever a cause is at
issue, and it shall appear that the trial will require an investi-
gation of accounts, or an examination of vouchers by the jury,
the court may appoint one or more auditors to hear the parties
and examine their vouchers and evidence, and to state the ac-
counts and make report thereof to the court."

In *Whitwell* v. *Willard*, 1 Met. 216, decided in 1840, a majority
of the court held that the Revised Statutes did not authorize the
court, without the consent of the parties, to appoint an auditor
in an action against an officer for not attaching numerous arti-
cles of personal property; and Shaw, C. J., said, that the issue
" involves no question of debtor and creditor, no examination
of book accounts or other vouchers, no relation in which one

party is accountant to the other, or in which any question of accounts can come collaterally in issue." He also said, that "the court would not be understood to intimate, that the authority to appoint auditors to examine vouchers and state an account, depends upon the form of the action, and may not extend to an action sounding in tort." The opinion in *Locke* v. *Bennett, ubi supra*, perhaps suggests that the court were not entirely satisfied with the decision of the majority in *Whitwell* v. *Willard*. See *Rich* v. *Jones*, 9 Cush. 329; *Kimball* v. *First Baptist Society in Amesbury*, 2 Gray, 517.

The St. of 1856, c. 202, did not purport to repeal pre-existing statutes; but it provided that, " whenever a cause is at issue in any court, whether the form of the action be contract, tort, or replevin, the justice of the court before whom the same is pending may, in his discretion, appoint one or more auditors to hear the parties and report upon such matters therein as may be directed by the said court; and the report in such case shall be *prima facie* evidence upon such matters only as are expressly embraced in the order of the court." The Gen. Sts. c. 121, §§ 46–50, were intended, as stated in *Fair* v. *Manhattan Ins. Co.* 112 Mass. 320, to be " a condensed re-enactment of the earlier statutes." The St. of 1863, c. 197, provided that " justices of police courts shall have no power to send any case to an auditor unless both parties shall assent thereto in writing." This, and the sections of the General Statutes which have been cited, were re-enacted in the Pub. Sts. c. 159, §§ 51–55. The Pub. Sts. c. 159, § 51, provide that, " when a cause is at issue, whether the form of the action is contract, tort, or replevin, a police, district, or municipal court, when both parties assent thereto in writing, and any other court in its discretion, may appoint one or more auditors to hear the parties, examine their vouchers and evidence, state accounts, and report upon such matters therein as may be ordered by the court," etc.

The question is whether the clause " whether the form of the action is contract, tort, or replevin," restricts the authority of a court to appoint an auditor to these three divisions of personal actions. We are of opinion that it does not. An action of waste, an action of ejectment, a writ of entry upon disseisin, and a writ of dower, are in our practice mixed actions, in which damages

are recovered as well as the possession of land; and the appointment of an auditor in these actions is often as necessary for the purposes of justice as in personal actions. The writ of entry to foreclose a mortgage has been held to resemble a suit in equity as much as an action at law, and there is special need in such an action for the appointment of an auditor. The original statute of 1817 authorized the appointment of auditors in any civil action, but it restricted them to an investigation of accounts. The St. of 1856, c. 202, was passed for the purpose of extending the authority of auditors to hear and report upon any matters in a cause upon which they were directed by the court to report. As the investigation of accounts would arise usually, although not exclusively, in actions of contract, and as the appointment of auditors before the St. of 1856, c. 202, had generally been made in actions of contract, the clause " whether the form of the action be contract, tort, or replevin," was inserted to show that the Legislature did not intend to confine the appointment of auditors to any particular form of personal actions. It may be true that the Legislature in making this enactment had in mind only personal actions, but the principal clause of the statute is general, and must be held to include any cause at issue; and this statute has been incorporated with the re-enactment of the St. of 1817, which in terms gave authority to appoint an auditor in any civil action.

In *Corbett* v. *Greenlaw*, 117 Mass. 167, no doubt was expressed of the power of the court to appoint an auditor in a petition to enforce a mechanics' lien. Indeed, in *Quimby* v. *Cook*, 10 Allen, 32, which was a bill in equity to redeem land from a mortgage, the court referred the case to an auditor to state the accounts between the parties; and the question raised was whether the auditor in his report had exceeded his powers, and the court say that, " by St. of 1856, c. 202, re-enacted in Gen. Sts. c. 121, § 46, the power [of auditors] is extended so as to embrace all causes at issue in every court, whatever may be the form of action," etc.

It is not necessary, however, in the present case to determine whether under existing statutes a court can appoint auditors in an equity suit. It may be said that the existing statutes seem to indicate that masters are to be appointed in suits in equity,

and auditors in civil actions at law. The Pub. Sts. c. 159, §§ 51–55, and the St. of 1817, c. 142, relate to actions at law; and the St. of 1817 provided that the report of the auditor or auditors " shall, under the direction of said court, be given in evidence to the jury, subject, however, to be impeached by evidence from either party," and this language is not directly applicable to suits in equity. At the time this statute was passed the equity jurisdiction of the Supreme Judicial Court was extremely limited, and it may be doubted whether the Legislature intended by this statute to authorize the appointment of auditors, as distinguished from masters in chancery, in suits in equity; and since the passage of the St. of 1827, c. 109, there has been no need of auditors in suits in equity, whatever may have been the early practice in equity in this Commonwealth. However this may be, we think that the existing statutes were intended to authorize the Supreme Judicial Court and the Superior Court to appoint an auditor or auditors in all civil proceedings at law, and that the appointment of an auditor in the case at bar was within the power of the court.

The rule to the auditor in the present case was not drawn in a form the most appropriate to the action; but it directs the auditor " to examine the claims and vouchers, and hear the parties thereon, and make report thereof to the court," and we think that this includes all the claims made by the parties to the action.

It appears in the exceptions, that the demandant claimed title to the land " on the east of the centre line of the road referred to in the deed from Stoughton to the Turner's Falls Company in 1857, and in the deed from Stoughton to Holmes and Wood in 1869," and " claimed no land west of " this centre line ; and that the tenants "claimed no title to any land east of said centre line of said road." It does, indeed, appear that the tenants claimed that the westerly boundary of the demandant's land was to the centre of the old road, southerly from a point where a line drawn from the bound under the old mill, and running northerly, crossed the old road, and thence northerly on said line to the east side of said road, and thence on the east side of the road to the northerly end of the demanded premises. The difference between these statements is, that in one the centre line

of the old road constitutes the entire westerly boundary line of the demandant's land, and in the other it constitutes only a part of that boundary.

The demandant's title is as follows. Timothy M. Stoughton conveyed certain lands, including the land in dispute, to Holmes and Wood, by deed dated April 10, 1869, and on the same day Holmes and Wood gave Stoughton a mortgage on the same lands. Both these deeds were recorded on June 14, 1869. Certain parcels, not including the land in dispute, were released from this mortgage by Stoughton, and thereafter, on May 22, 1877, the mortgage was assigned by Stoughton to Peleg Adams; and Adams, on February 28, 1882, entered on the lands then included in the mortgage for breach of condition, and on March 18, 1882, acting under the power of sale contained in the mortgage, sold all the land then included in the mortgage, in separate parcels, to different purchasers, selling one parcel to the demandant; and on April 1, 1882, Adams executed and delivered a deed of this parcel to the demandant.

The tenants' title to this and the adjoining land is as follows. Stoughton, by deed dated October 6, 1857, conveyed certain land to the Proprietors of the Upper Locks and Canals on the Connecticut River, and this corporation by the St. of 1866, c. 275, became the Turner's Falls Company. The easterly line of this land was the road leading to the ferry, being the "old road" above mentioned. On October 3, 1867, the Turner's Falls Company gave Holmes and Wood a twenty years' lease of this land, or some of it, in which was included a tract of land which was bounded " easterly by the ferry road." This lease was assigned by Holmes and Wood to the Turner's Falls Lumber Company, on May 11, 1872, and on the same day Holmes and Wood gave a written lease of a tract of land, which included the land in dispute, to the Turner's Falls Lumber Company, for twenty years from October 3, 1867. The tract was bounded " westerly and southerly by land of Turner's Falls Company," etc. At this time Holmes and Wood owned the equity of redemption in the land demised by them, subject to the mortgage to Stoughton. The parcels of land described in these two leases adjoined each other, and the Turner's Falls Lumber Company was therefore, until October 3, 1887, the lessee of the parcel of

land which the demandant claimed, and was for the same time the assignee of the lease of the adjoining parcel of land, which belonged to the Turner's Falls Company.  The westerly bound-ary of the demandant's land was the easterly boundary of the land of the Turner's Falls Company, and this boundary, for a part at least of the distance, was the road leading to the ferry. The Turner's Falls Lumber Company was, until October 3, 1887, in possession of both parcels under these leases.

The principal dispute between the parties at the trial was as to the location of this ferry road at the time when the Turner's Falls Company and Holmes and Wood respectively acquired their titles from Stoughton.  For the purpose of showing where this road was in 1867, the demandant put in the testimony of Nathaniel Holmes, of statements made to him in May, 1867, concerning the easterly boundary of the land of the Turner's Falls Company, by Alvah Crocker and Wendell T. Davis while they were " in the highway adjacent to the premises," and were in negotiation for the lease, which was given on October 3, 1867, by the Turner's Falls Company to himself and Wood.  It is said, and not denied, that Crocker and Davis had deceased be-fore the trial.  The bill of exceptions states that "at this time Alvah Crocker was president and Wendell T. Davis was treas-urer of the Turner's Falls Company, and the same persons named in the votes of the company and in the testimony of Nathaniel Holmes."  It is argued by the counsel for the Tur-ner's Falls Company, that Davis was not treasurer at this time, although he became treasurer before the lease was executed, and he refers to certain pages in the records of that company; but the records referred to are not before us.  In the exceptions, as we understand them, it appears that he was treasurer, and, if it were material to the decision, we should take the exceptions in this respect to be true unless they were amended.

The Turner's Falls Company was authorized to make a lease of its lands.  See St. 1866, c. 275, § 3.  Its by-laws, adopted on September 1, 1866, provided as follows :  " He [the president] may make such leases and contracts of water power and sales or leases of land as he may see fit, subject to the instruction or approval of the directors.  The president and treasurer are hereby authorized to sign such deeds and documents as may be

necessary to consummate said sales and leases, and to affix the corporate seal thereto." The directors, at a meeting held on September 1, 1886, voted " that the president be and hereby is authorized for and in behalf of this board of directors to make contracts for such labor and materials as may be needed in building our works, and also to sell or lease the lands or water power of this company, and with the treasurer to execute deeds and leases in writing therefor, and attach the seal of the company thereto, with authority to make legal acknowledgment of the same in behalf of this company." The other votes of the company recited in the exceptions apparently were subsequent to the conversation testified to by Holmes. The lease was, we infer, executed by Crocker as president, and Davis as treasurer, in behalf of the company. The question is whether the declarations of these officers of the Turner's Falls Company in regard to the boundary line of its land, made near to and in sight of the land while negotiating a lease of it, are admissible against that company, and also against the Turner's Falls Lumber Company, the assignee of the lease. It is argued that the declarations of Crocker and Davis are, in effect, the declarations of a deceased owner of land while in possession, which are admissible against him and his subsequent grantees to prove the boundaries of his land at the time he made the declarations. See *Chapman* v. *Edmands*, 3 Allen, 512; *Long* v. *Colton*, 116 Mass. 414; *Flagg* v. *Mason*, 141 Mass. 64; *Rowell* v. *Doggett*, 143 Mass. 483.

A corporation must act through agents. In this case, there was evidence that Crocker, the president, had full authority to sell and to lease the lands and water power of the company, the treasurer executing with him the deeds or leases. We think that this implies that he had an authority on behalf of the company to point out the boundaries of the land to be sold or leased, and that his statements made when negotiating a sale or lease must be regarded as the statements of the company, and that they are admissible against the company, and, as he has since deceased, that they are admissible against subsequent grantees of the company. It may be doubtful whether the statements of the treasurer can be regarded as the statements of the company; but it appears that the president and the treasurer

were together when the statements were made, and the witness does not distinguish between the statements made by each, and evidence of statements made by the treasurer in the presence and hearing of the president, and not denied by him, would be some evidence that the president assented to what the treasurer said. The objection of the tenants to the admission of the evidence was general, and if the tenants intended to ask the court to distinguish between the statements of the president and those of the treasurer, it was their duty specifically to call the attention of the court to the distinction, and to ask a ruling upon it.

For the same reason, the other objection cannot be considered which is now taken, namely, that the by-laws and the vote of the directors, which have been cited, were not warranted by the charter or by the notice of the meetings at which they were passed. The full records of the corporation or of the directors are not before us. The stockholders subsequently ratified the lease given to Holmes and Wood. It was competent for the jury to find that Crocker, at the time he made the statement, was acting under the votes which had been passed; and we do not know that the demandant would not have been able to produce evidence which would have removed this objection, if it had been made known at the trial. The testimony of Holmes did not tend to contradict the lease, because that bounded the land demised " easterly by the ferry road," but did not define the location of that road.

The tenants also asked the court to instruct the jury, "that if the Turner's Falls Company by its tenant, the Turner's Falls Lumber Company, was in possession of any portion of the premises described in the plaintiff's writ, claiming title thereto at the time of the sale of the premises to the plaintiff, the plaintiff cannot recover in this suit any of the property so claimed, and so in the possession of the Turner's Falls Company at the time of said sale." Adams was the assignee of the mortgage given by Holmes and Wood on April 10, 1869, and recorded on June 14, 1869, and he " made open, peaceable, and unopposed entry on the portions of the premises described in said mortgage, not heretofore released by the mortgagee, or by said Adams, for the purpose by him declared of foreclosing said mortgage for breach of

the condition thereof," on February 28, 1882, in the presence of two witnesses, who signed a certificate of such entry, and swore to it before a justice of the peace on the same day, and this cerficate was duly recorded on March 4, 1882. He also duly advertised the lands mortgaged, excepting those portions which had been released, for sale at public auction on the premises, on said February 28, pursuant to the power of sale contained in the mortgage. The sale was adjourned to March 18, 1882, when the parcels were sold separately on the premises, the lot last described in the mortgage being sold to the demandant. The advertisement of the sale states that " the sale will be in parcels, or entire, as will be most beneficial to the parties in interest, or of such part only as will satisfy the claim secured by the mortgage."

The affidavit of the sale made by Adams states that " I offered by Samuel J. Lyons, a duly licensed auctioneer, said premises for sale, in three parcels, or entire, as the same should sell for the highest price; and for want of bidders for said premises, and at the request of the parties in interest, said sale was adjourned," etc.; and that at the adjournment, " as no one would bid more for the entire estate than for the estate in parcels, the same was sold by said auctioneer in three parcels, to wit," etc. The deed given by Adams is dated April 1, 1882, and is acknowledged and recorded on the same day. The exceptions state that this deed was delivered in Greenfield. The point intended to be raised by the tenants is, that, if Adams was disseised at the time the deed to the demandant was delivered, then, as it was not delivered upon the land, nothing passed by the deed. The tenants did not claim title by disseisin to the land included in the mortgage.

So far as the Turner's Falls Lumber Company occupied under the lease from Holmes and Wood, it occupied under mortgagors whose title was subject to the mortgage held by Adams. So far as it occupied under the lease of the Turner's Falls Company, which had been assigned to it, it occupied under a title to which Adams, as assignee of the mortgage, had no claim. As the parcels adjoined each other, but as the boundary between them was uncertain, it is possible that the Lumber Company may have occupied the land demanded, or some of it, under the belief and

claim that it was included in the lease given by the Turner's Falls Company, of which it was the assignee.

The request of the tenants proceeds upon the theory that, if the Turner's Falls Lumber Company at the time of the mortgage sale was in the possession of the demandant's land, claiming title thereto, this was a disseisin by the Turner's Falls Company. But no evidence is recited that the Turner's Falls Company ever claimed title to any part of the land which the demandant claimed. The evidence of the declarations of the officers of this company was put in by the demandant, to show that that company claimed that the boundary line was where the demandant claimed it to be. No evidence appears that the Turner's Falls Company put Holmes and Wood, or the Lumber Company, into the possession of any of the demandant's land, and the lease by the Turner's Falls Company purported to bound the land demised easterly by the ferry road. If, after the Turner's Falls Lumber Company took possession under this lease, it claimed the boundary to be farther to the east, and if it occupied some of the demandant's land under a claim of right derived from the lease of the Turner's Falls Company which had been assigned to it, this is not a disseisin by the Turner's Falls Company ; if it is a disseisin at all, it is a disseisin by the Turner's Falls Lumber Company. The tenants' request ought not, therefore, to have been given in the form in which it was made.

If one person disseises another of land, and while in possession leases the land to a tenant who continues to occupy it under his lease, the adverse possession of the tenant may be tacked to that of the landlord, and the possession of the tenant may be said to be that of the landlord ; but if the landlord never had possession of the land, nor claimed title to it, and did not include it in the lease, the possession of the tenant beyond the boundaries of the land contained in the lease is not the possession of the landlord, even although the tenant believes that he is occupying only the land demised. *Melvin* v. *Proprietors of Locks and Canals,* 5 Met. 15.

It is settled that a mortgagee of land may be disseised by a stranger, and that while he is disseised he cannot make a valid assignment of his mortgage. *Dadmun* v. *Lamson,* 9 Allen, 85. It is said in the opinion in that case, " Whether this ancient

rule of law is consistent with the present mode of transfer of title to real property, and is well adapted to the condition and wants of the community, is a question for the legislative branch of the government." It may, perhaps, at some time deserve further consideration whether a mortgagee, in a power of sale mortgage, who enters on the land for breach of condition, and then sells it at public auction upon the land pursuant to the power, does not convey a good title, even although the deed is delivered a few days after the sale, and is not delivered upon the land, and he is disseised at the time of the delivery. It has been held, that " exclusive possession by a mortgagor and those claiming under him, with a claim of exclusive ownership, does not of itself amount to a disseisin of the mortgagee so as to invalidate a transfer of the mortgage title," or the valid execution of a power of sale contained in a mortgage. *Murphy* v. *Welch*, 128 Mass. 489. *Hunt* v. *Hunt*, 14 Pick. 374. *Sheridan* v. *Welch*, 8 Allen, 166. *Lincoln* v. *Emerson*, 108 Mass. 87. *Johnson* v. *Bean*, 119 Mass. 271.

The instructions of the presiding justice upon the question of disseisin are open to the criticism, that they assume that there was some evidence that the Turner's Falls Company claimed to hold the land demanded under Holmes and Wood, an assumption that would undoubtedly have been corrected if the attention of the justice had been called to it. But in substance the instructions, we think, are correct. These instructions first define with substantial accuracy what constitutes a disseisin by a stranger, and then go on to define what constitutes a disseisin of a mortgagee by a mortgagor, or by those claiming under him. The presiding justice instructed the jury, that to constitute a disseisin of a mortgagee by a mortgagor, or by those claiming under him, it must be made known to the mortgagee that the mortgagor or his grantees make some claim adverse to the mortgagee.

There are expressions in our reports to the effect that a mortgagor cannot disseise his mortgagee. In *Lennon* v. *Porter*, 5 Gray, 318, it is said that " it is well established that a mortgagor, especially after entry, cannot disseise his mortgagee, or defeat his right of possession. All such acts are held to be done in subordination to the title of his mortgagee." In *Sheridan* v.

*Welch, ubi supra,* it is said that " there is nothing in the agreed statement of facts to show that any claim adverse to the mortgage was known to the mortgagee, and the facts do not show that he was disseised," and there is a similar statement in *Murphy* v. *Welch, ubi supra.* The statement of the law generally made is, that " neither the mortgagor nor his grantee holds adversely to the mortgagee, until he has distinctly disclaimed holding under him and asserted title in himself." 3 Washb. Real Prop. (5th ed.) 154. This, we think, is the correct rule, and it was substantially the rule laid down by the presiding justice. *Tripe* v. *Marcy,* 39 N. H. 439. *Medley* v. *Elliott,* 62 Ill. 532. *Maxwell* v. *Hartmann,* 50 Wis. 660. *Parker* v. *Banks,* 79 N. C. 480. *Coldcleugh* v. *Johnson,* 34 Ark. 312. *Coyle* v. *Wilkins,* 57 Ala. 108. *Martin* v. *Jackson,* 27 Penn. St. 504. *Zeller* v. *Eckert,* 4 How. 289, 295.

Whether the occupation of the mortgagor and those claiming under him may not be of such a character as of itself to give notice to the mortgagee that they repudiate his title, and claim title adversely to him, or whether in all cases the mortgagee must be shown to have had actual notice or knowledge of such a claim, need not be decided in this case. If the tenants intended to raise these questions, they should have specifically asked the court to rule upon them, if there was any evidence which in their opinion made it necessary or proper that the law in this respect should be determined.

The Turner's Falls Lumber Company asked the court to rule that the foreclosure of the mortgage was not valid, because the premises were sold in three parcels, and it contended that it had a right to redeem, and asked the court to order a conditional judgment. The court declined to grant these requests, and ruled that these questions " were immaterial at this stage of the case." The Lumber Company has argued its exceptions to this refusal and ruling. It contends that a tenant for years has a right to redeem, and that, although the term has now expired, the right to redeem must be determined as of the date of the writ, which was March 3, 1883. The Lumber Company filed its motion for conditional judgment on June 30, 1887. See Pub. Sts. c. 181, § 3. We see no ground for the motion. In this case as reported in 142 Mass. 590, the court did not find it necessary to decide whether

there had been a valid execution of the power of sale. The contention then was that Adams alone could not execute the power, because the mortgage had been assigned to him to hold " as collateral security." But the assignment conveyed to Adams the legal title to the mortgage, and we do not see why, as against the mortgagor and those claiming under him, he could not execute the power as fully as if the assignment had been absolute. Several distinct parcels of land were included in the mortgage, and we see no reason why they could not be sold at one sale to separate purchasers. This is often the best method of selling different parcels of land, and it is not suggested that Adams did not make the sale in such a manner as to obtain the most money for the land.            *Exceptions overruled.*