MARY J. ELWELL *vs.* EMMA P. BARBRICK & others.

Middlesex.   December 15, 16, 1931. — May 20, 1932.

Present: RUGG, C.J., PIERCE, WAIT, SANDERSON, & FIELD, JJ.

*Adverse Possession or Use.*

Where it appeared that successive owners of a lot of land and a house thereon did not occupy it personally, that it was occupied nearly continuously for more than twenty years by successive tenants, only one of whom had a lease in writing, and that during that period the tenants, their guests and tradesmen continuously and openly used a clearly marked dirt foot path running from the back door, back yard and cellar door of the house to a nearby street across a portion of an adjoining lot, which was unfenced wild land, and kept 'the grass around the path mowed most of the time, but it did not appear that the owners of the first lot knew that their tenants were using the path under a claim of right adverse to the title of the owner of the adjoining lot or authorized their tenants to take possession of that portion of the adjoining lot as their agents or personal representatives, a conclusion was not warranted that such use of the path by the tenants was a use adverse or under a claim of right by the owners.

Even if, in the circumstances above described, there was disseisin of the owner of the adjoining lot by tenants of the first lot, there was no continuous privity of estate between the owners and tenants of the first lot.

A succeeding owner of the first lot in such circumstances had no title to the path by adverse use or possession.

BILL IN EQUITY, filed in the Superior Court on January 19, 1931.

The bill and material facts found by a master to whom the suit was referred are described in the opinion. By order of *Broadhurst,* J., there were entered an interlocutory decree sustaining certain of the defendants' exceptions to the master's report, overruling an exception by the plaintiff and otherwise confirming the report; and a final decree dismissing the bill. The plaintiff appealed from both decrees.

*A. T. Smith,* (*F. V. Terry* with him,) for the plaintiff.

*L. G. Roberts,* for the defendants.

PIERCE, J. This is a bill in equity brought on January 19, 1931, in which the plaintiff alleges, in brief, that she owns a parcel of land with a two-family house thereon on Circuit Avenue, in Newton Highlands, Massachusetts; that she has acquired title to a strip of lot 19 north of and adjoining lot 18 by reason of the continuous adverse use and occupation of the strip by herself and her predecessors in title for over twenty years. The plaintiff prays that the size of the strip and her rights in it may be established, and that the defendants be enjoined from interfering with her rights therein and required to restore the strip to its original condition. The defendants answered denying adverse continuous occupation and setting up lack of equity as a defence. The case was referred to a master who duly made his report. Certain objections were taken to the report by both plaintiff and defendants. By an interlocutory decree the plaintiff's objections were overruled, and the defendants' objections enumerated in the order for interlocutory decree were sustained. Except as modified the report was confirmed. A final decree was entered dismissing the bill with costs to the defendants. The case comes before this court on the appeal of the plaintiff from the interlocutory and final decrees.

The facts which follow are gleaned from the report of the master and from the plans annexed to the bill of complaint as Exhibits "A" and "B." In June, 1899, and before, the Phoenix Real Estate Company owned a tract of "unfenced wild land covered with underbrush and small birches" near Eliot Station, Newton. Being desirous of developing the described tract, the owner caused it to be divided into twenty-five lots, with boundaries and measurements as shown on a plan recorded in the Middlesex registry of deeds. In 1900 a two-family house was built on lot 16 and one on lot 18. At about the same time a single family house was built on each of lots 23 and 25.

The title to lot 18 came to the plaintiff by virtue of a deed from one Henry S. Brown, dated December 26, 1918, and recorded in said registry on December 31, 1918. This title came to the plaintiff through twenty-two successive record owners, some of the conveyances being at foreclosure sales. "In none of the conveyances is there any mention of or reference to a right to use any part of lot 19 in connection with the use of lot 18." "Except for a Mr. Schafer, who owned lot 18 from February 3, 1912, to November 20, 1917, and lived there for about a year, and for . . . [the plaintiff], who bought the property for investment and who with her husband has lived there since October 29, 1929, none of the owners of lot 18 lived on the premises and all of them who testified owned the property for the purpose of reselling at a profit. The house had tenants in it continuously from 1900 . . . except for one month in 1912 and from December 1, 1925, to June 1, 1926. Generally both apartments were occupied. There was no evidence that any tenement [tenant?] held by a written lease except for one with a two-year lease from August 1, 1926."

The defendant John Paulini became the owner of the east portion of lots 19 and 20 on June 16, 1928, by a deed from Martha N. and Malcolm G. Blue, duly recorded. The defendant Emma P. Barbrick became the owner of the west portion of lots 19 and 20 on September 17, 1928, by similar recorded deed from the same grantors. The titles to lots 19 and 20 came to the defendants through

fifteen successive owners. "Neither of these lots was used for anything until . . . [the defendants] took title except for the use of the disputed strip hereinafter referred to and the use with permission of the owner of lots 19 and 20 of a portion, disconnected from the disputed strip, as a garden for about two years by an occupant of . . . [the plaintiff's] house. They and also lots 21 and 22 were unfenced wild land covered with underbrush and small birches, crossed by pedestrians and played on by children indiscriminately. Mrs. Barbrick paid the assessment for a sidewalk on Circuit Avenue to the lot line between lots 18 and 19 which was built in February, 1930."

It is not contended that any adverse use of lot 19 was made before 1904. "The first occupant of the house on lot 18, who lived there till about March, 1904, the side porch being then in its original width and extending pretty close to the actual lot line, wheeled his ashes from the cellar door on the banking close beside the side porch and then around the front corner of the side porch onto the side front path and via that path to Circuit Avenue." Sometime between March and July, 1904, the occupants (tenants at will) of the plaintiff's house "trod out a path from Circuit Avenue to the foot of the back steps and to the cellar door. The path was a natural dirt path through the rough ground of lot 19 made by persons walking single file following the foot of the banking (that running northerly from . . . [the plaintiff's] house) as they naturally would in order to get from Circuit Avenue to the back steps and cellar door. It was not at any time defined except by the baring and wearing down to a dish-shaped depression of the soil where the grass was trodden away. Therefore, it was not of a constant width. It remained clearly marked and in substantially the same location until about June, 1928." "The above path was used for all the usual purposes of a path to the back door, back yard and cellar door, including passage by the occupants of . . . [the] house and their guests and passage by various tradesmen . . . from July, 1904, to July 15, 1930." An occupant of the house "commenced in 1904 to mow along the path including a short

distance north of it and to keep the grass between the path and the house and between the path and the side front walk cut down with a sickle. For most of the time from July 24, 1906, to April 15, 1912 the family which occupied the downstairs apartment mowed the length of the path and a foot or two north of it and kept the space between the path and the house and from the path all across the front of the house mowed. They also planted a flower garden close to the side porch running its entire length and extending out to a width of about two feet. From this time on the part of lot 19 south of the path was usually, but intermittently, kept mowed. The flower garden remained in the same place but was frequently uncared for. The strip was treated by the occupants of the house as going with the house." The master found, upon the facts recited and upon additional facts which need not be stated in the view we take of the law applicable thereto, "that . . . [the plaintiff] and her predecessors in title used the disputed strip under claim of right, adversely and continuously from about July, 1904, to late November or early December, 1929." As a conclusion of law upon the facts found the judge of the Superior Court ruled that "the origin and nature of the use by the plaintiff and her predecessors in title, and their tenants, of the defendants' land, are as consistent with a finding that it was permissive as that it was adverse," and that "There is nothing in the master's report to warrant his conclusion that the use was under a claim of right or that it was exclusive."

The order for the entry of the final decree dismissing the bill with costs was required by law. The master makes no finding that any one of the twenty-two holders of title under whom the plaintiff claims, between 1904 and 1928, with the exception of one Schafer, who lived on lot 18 for about one year following 1912, was ever possessed in fact of lot 18 or knew that a portion of lot 19 was used by occupants of the house on lot 18 under a claim of right adverse to the title of the owners of lot 19 which, in the large, was "wild land." He makes no finding that any one of said predecessors in title of the plaintiff ever expressly or impliedly authorized

any occupant of lot 18 to enter upon the adjoining lot 19 and there to take possession of it as his agent, servant or personal representative. Adverse possession to ripen into title must be such as would have exposed the one in possession to an action because of what was done by him or by his authorization or direction at any time during the prescriptive period that his possession continued. On the facts found no action of trespass would have lain against any one of the twenty-two predecessors in title of the plaintiff by the owner for the time being of lot 19, the redress, if any, being against the occupants and tenants of lot 18. The disseisin of the owners of lot 19, if such there was, by the tenants of lot 18, continued for the requisite period of limitation, could not create title in the plaintiff because there was no continuing privity of estate between the successive tenants and occupants of lot 18. It was decided in *Holmes* v. *Turner's Falls Co.* 150 Mass. 535, at page 547, that "If one person disseises another of land, and while in possession leases the land to a tenant who continues to occupy it under his lease, the adverse possession of the tenant may be tacked to that of the landlord, and the possession of the tenant may be said to be that of the landlord; but if the landlord never had possession of the land, nor claimed title to it, and did not include it in the lease, the possession of the tenant beyond the boundaries of the land contained in the lease is not the possession of the landlord, even although the tenant believes that he is occupying only the land demised. *Melvin* v. *Proprietors of Locks and Canals*, 5 Met. 15."

With this view of the controlling principles of the law applicable to the facts of the case, we do not think it necessary to review the decision and rulings of the judge upon the objections taken by the plaintiff.

*Decree affirmed with costs.*