NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1343                                        Appeals Court

AM PROPERTIES, LLC  vs.  J&W SUMMIT AVE, LLC.

No. 15-P-1343.

Suffolk.     May 17, 2016. - March 8, 2017.

Present:  Cypher, Blake, & Henry, JJ.

Adverse Possession and Prescription.  Real Property, Adverse
    possession.

Civil action commenced in the Land Court Department on
September 27, 2013.

The case was heard by Alexander H. Sands, III, J., on
motions for summary judgment.

Joseph L. Bierwirth, Jr. (Ryan P. McManus also present) for
the defendant.
Ann M. Sobolewski for the plaintiff.

HENRY, J.  The plaintiff, AM Properties, LLC (AM), brought

an action in the Land Court seeking to (1) establish title by

adverse possession to a strip of land (the strip) that is part

of the property of the defendant, J&W Summit Ave, LLC (J&W), and

(2) permanently enjoin J&W from interfering with rights in an

easement for passage over J&W's property (the passageway).  J&W counterclaimed, denying AM's claim of title to the strip and asserting its own adverse possession claim to extinguish AM's rights to the passageway.  The central issue in the case is whether AM is entitled to include, or "tack" on, an approximate six-year period of nonpermissive use of the strip by a tenant of a prior owner to satisfy the twenty-year requirement for a claim of adverse possession.  On cross motions for summary judgment, a Land Court judge answered this question in the affirmative and ruled in AM's favor on all claims.  J&W has now appealed from that judgment.

As is well established, a review of a summary judgment ruling is de novo, taking the facts, along with the reasonable inferences that can be drawn therefrom, in a light most favorable to the party against whom judgment is to enter.  See Miller v. Cotter, 448 Mass. 671, 676 (2007); Albahari v. Zoning Bd. of Appeals of Brewster, 76 Mass. App. Ct. 245, 248 n.4 (2010).  To that end, we conclude that there is no genuine dispute of material fact[1] and that AM is entitled as a matter of law to tack on the prior period of tenancy to establish adverse possession.  Accordingly, we affirm.

---

[1] In many instances where J&W has "disputed" facts, it disputes the legal significance of those facts, not the facts themselves.

Background.  The following undisputed material facts are evident from the record.  A specialty food store named Bazaar International Gourmet (Bazaar) has operated on the AM property at 1432 and 1432A Beacon Street in Brookline since December, 1993, initially under a lease that commenced September 1, 1993.  At that time, the lessee and operator of Bazaar was a corporation formed by Alexander Zelfond called I.G.F., Inc. (IGF).  Subsequently, Zelfond formed AM to purchase the property in 1999.  Zelfond then formed a third entity, I.V.A. Foods, Inc. (IVA), in April, 2000, to continue to operate Bazaar.

The J&W property is north of the AM property and borders on Summit Avenue.  Most of the J&W property is occupied by a parking lot.

1.  The strip.  At issue here is a rectangular strip of land on the J&W property located between the rear boundary of the AM property and the southern end of the J&W parking lot.  The strip is at a "significantly" lower elevation than the balance of the J&W property, and is bounded on the north by a cement retaining wall rising 5.23 feet in height from the level of the strip to the level of the J&W parking lot.  On the southerly edge of the strip, a railroad tie retaining wall runs the length of the boundary between the strip and the AM property, just a few feet from the rear of the building housing Bazaar.  The strip is at a higher elevation than the AM

property,[2] but the elevation difference is significantly less than the difference between the strip and the parking lot on the other side.  A set of stairs allows for travel from the AM property and the strip up to the J&W parking lot, and then to the passageway to Summit Avenue.

    a.  <u>The tenancy</u>.  The lease between IGF and the former owner of the AM property (the landlord), executed in August, 1993, designated the leased premises by reference to the street address, "together with the basement thereunder."  The lease did not include a description of the square footage, a reference to any plan, or any specific mention of the strip.  During Zelfond's negotiation of the lease with the landlord, no distinction was made between the strip and the area behind the building on the AM property.  Zelfond and an agent of the landlord walked through the building and onto the strip during negotiations and the agent never suggested that the strip was not part of the leased premises.  Subsequently, during the many conversations the two had throughout the term of the tenancy, the landlord's agent never told Zelfond to stop using the strip.  Zelfond also never sought or received permission from anyone connected with the J&W property to use the strip.

---

[2] The record does not provide an exact measurement of the difference in elevation or height of the railroad tie retaining wall.

b. <u>Use of the strip</u>. The Zelfond-related entities (IGF, IVA, and AM) took actions consistent with ownership of the strip. In August, 1993, before the lease term commenced, IGF took possession of the AM property and began to use the strip. During August and September, 1993, IGF levelled the strip and used it as a temporary staging area while it renovated the property. Since the day Bazaar first opened in December, 1993, the store has operated seven days per week, only closing for legal holidays. Throughout that time, Zelfond and employees of Bazaar continuously used the strip to store equipment and supplies related to the operation of the store, repaired the retaining wall along the J&W parking lot, maintained the strip by clearing it of snow and leaves and by pruning trees and bushes, and accessed the strip, sometimes dozens of times per day, for these and other purposes. IVA or AM maintained compressors on the strip, if not continuously throughout the relevant time period, then at least for stretches of time throughout that period.[3] Beginning in 1995, IVA or AM also

---

[3] In addition to the evidence that compressors were installed on the strip prior to the December, 1993, opening of Bazaar, compressors were observed on the strip in, at the very least, 1998 and 2001, and were still located on the strip at the time of the summary judgment proceedings in 2015.

installed and began frequently accessing a walk-in cooler on the strip.[4]

In 2007, AM hired a contractor to install a metal chain link fence along the top of the concrete retaining wall bounding the parking lot and the strip, which bore a sign facing the parking lot that read, "No trespassing, Private property." There is no evidence in the record that anyone connected with the J&W property objected to the installation of the fence or sign, and both remained in place through the summary judgment proceedings.

The only evidence that anyone connected with the J&W property accessed and used the strip is the testimony of a property manager hired by J&W's predecessor to the effect that, once a year during his tenure from 1998 to 2011, he would inspect the concrete retaining wall.[5]  There is no evidence in the record that the property manager ever encountered, or was

---

[4] This cooler was removed in 1999.  It was replaced in 2007, and remained in place on the strip through the time of the summary judgment proceedings.

[5] The property manager also hired a cleaning company to occasionally "police" the J&W property, including the strip, for trash.

observed by, anyone connected with the AM property when he conducted these inspections.[6]

2. The passageway. There is no space between the building on the AM property that houses Bazaar and the buildings on the properties located immediately to the east and west. As such, there are only two means of ingress and egress from the AM property. The first is to and from the sidewalk along Beacon Street in front of the building. The second is via the passageway -- a five-foot-wide deeded easement to Summit Avenue that travels over the J&W property.[7]

J&W's parking lot has been licensed for sixteen cars since June, 1993. In 1999, the parking lot was resurfaced and lines delineating the parking spaces were painted. Several of these parking lines extended into the passageway. As a result, cars parked in those spaces extended into the passageway and obstructed travel along the easement. There is no evidence in

---

[6] Zelfond and certain employees and contractors connected with the AM property never observed anyone connected with the J&W property on the strip.

[7] The deed to AM describes the easement rights: "Together with the right to use the five foot passageway on the North and Northwesterly side of said lot A-2 leading out to Summit Avenue in common with others entitled thereto." Slightly more than half way across the J&W property the five-foot-wide easement joins a ten-foot-wide easement before it empties onto Summit Avenue. The ten-foot-wide easement does not otherwise appear to be at issue in this case.

the record that there were painted parking lines on the surface of the parking lot prior to 1999.[8]

Discussion. 1. AM's adverse possession of the strip. "Title by adverse possession can be acquired only by proof of nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years." Ryan v. Stavros, 348 Mass. 251, 262 (1964). "The burden of proof in any adverse possession case rests on the claimant and extends to all of the necessary elements of such possession." Sea Pines Condominium III Assn. v. Steffens, 61 Mass. App. Ct. 838, 847 (2004). To satisfy the twenty-year requirement, a claimant may "tack" onto its own period of use a period during which a predecessor in privity asserted an adverse right to the property. See Shoer v. Daffe, 337 Mass. 420, 424 (1958).

a. Tacking on a period of tenancy. The motion judge concluded that AM could satisfy the twenty-year adverse possession requirement as to the strip by "tacking" together the use of the strip during AM's fourteen years of ownership of the property on which Bazaar was located, and IGF's prior use of the strip for six years while it occupied the property as a tenant. J&W argues that such tacking is not permissible unless the

_____

[8] J&W's former property manager recalled that, even before the lines were painted in 1999, cars would park within the bounds of the passageway. His involvement with the J&W property, however, dated back only to 1998.

landlord during IGF's period of tenancy had possession of the disputed property, or claimed title to it, and included it in the lease to IGF.  In support of this proposition, J&W cites to Holmes v. Turner's Falls Co., 150 Mass. 535 (1890) (Turner's Falls), and Holmes v. Johnson, 324 Mass. 450 (1949) (Johnson). The rule enunciated in those two cases, however, has been implicitly overruled.  See Ottavia v. Savarese, 338 Mass. 330 (1959); Kendall v. Selvaggio, 413 Mass. 619 (1992); Totman v. Malloy, 431 Mass. 143 (2000).  The argument, therefore, cannot be sustained.

In Turner's Falls, the Supreme Judicial Court first addressed the tacking of a period of tenancy for purposes of adverse possession and held:

> "If one person disseises another of land, and while in possession leases the land to a tenant who continues to occupy it under his lease, the adverse possession of the tenant may be tacked to that of the landlord, and the possession of the tenant may be said to be that of the landlord; but if the landlord never had possession of the land, nor claimed title to it, and did not include it in the lease, the possession of the tenant beyond the boundaries of the land contained in the lease is not the possession of the landlord, even although the tenant believes that he is occupying only the land demised."

150 Mass. at 547.

Almost sixty years later, the issue came to the fore again in Johnson.  There, the plaintiff's mother had owned their property, and the plaintiff and her family had openly used the adjacent, disputed strip of land as though it were their own,

for a period of thirteen to fifteen years. 324 Mass. at 451-452. Subsequently, after the bank holding her mother's mortgage foreclosed, the plaintiff continued both to occupy the property as a tenant of the bank and use and possess the disputed strip as her own. Ibid. Then, after approximately four years as a tenant, the plaintiff purchased the property back from the bank and continued to live there, using the disputed strip, for some seven years more, at which point the adjoining landowner, the defendant Johnson, entered the strip and asserted ownership. Ibid.

According to the Supreme Judicial Court, the "question for decision [in Johnson was] whether the plaintiff has shown that the possession of her family and herself was under a continuous claim of right or title for twenty years." Id. at 453. The court answered that question in the negative and held:

> "[W]hen title to [the leased property] was in the bank and the plaintiff was its tenant, [the tenant's] possession of the disputed area was under a claim of right to hold it not in fee but only as a tenant of the bank. As the bank never had possession of the disputed area, nor claimed title to it, and did not include it in its letting to the tenant, the possession of the tenant beyond the boundaries of [the lessor's premises] cannot be considered to be the possession of the [lessor]. Holmes v. Turner's Falls Co., 150 Mass. [at] 547; Elwell v. Barbrick, 279 Mass. 272, 277 [1932]. As the continuity of possession under a claim of right to the title was interrupted, the conclusion of the master that the plaintiff has not acquired title by adverse possession was correct."

Id. at 454-455.

Ten years later, however, the Supreme Judicial Court decided Ottavia, wherein it acknowledged that the rule in Johnson had been "severely criticized" and that "there seems to be no justification for requiring a claim of right or title as essential to an adverse possession." Ottavia, 338 Mass. at 333 (quotation omitted). Instead, the court shifted the focus to nonpermissive use, stating:

> "'The great majority of the cases establish convincingly that the alleged requirements of claim of title and of hostility of possession mean only that the possessor must use and enjoy the property continuously for the required period as the average owner would use it, without the consent of the true owner and therefore in actual hostility to him irrespective of the possessor's actual state of mind or intent.' Am. Law of Property, § 15.4, pp. 776-777. From the standpoint of the true owner, the purpose of the various requirements of adverse possession . . . is to put him on notice of the hostile activity of the possession so that he, the owner, may have an opportunity to take steps to vindicate his rights by legal action. Where a claim of right is made or where an intention to oust exists and is communicated or is open and notorious, the purpose of notice is satisfied, for it is likely that the encroachment and the fact of its hostility will come to the attention of the true owner. The nonexistence of a claim of right or intent to oust does not, however, necessarily preclude notice. Where the user has acted, without license or permission of the true owner, in a manner inconsistent with the true owner's rights, the acts alone (without any explicit claim of right or intent to dispossess) may be sufficient to put the true owner on notice of the nonpermissive use."

Id. at 333-334.

The court subsequently elaborated upon this shift. First, in Kendall, the court cited Ottavia and stated that, "[i]nstead of focusing on what the parties said twenty or more years ago,

we have held repeatedly that courts must look to the physical facts of entry and possession as evidence of an intent to occupy and to hold property as of right. . . . The justification for this position is that, if inconsistent with the true owner's rights, the possessor's actions and not his intent provide notice of nonpermissive use to the true owner." Kendall, 413 Mass. at 624. Then, in Totman, the court cited Ottavia and Kendall and declared that "[t]he guiding principle behind the elements of adverse possession is not to ascertain the intent or state of mind of the adverse claimant, but rather to provide notice to the true owner, allowing for the legal vindication of property rights." Totman, 431 Mass. at 145.

Whereas Turner's Falls and Johnson focused on whether the landlords in those cases had asserted a technical claim to title and their intent as to the disputed area,[9] Ottavia shifted the focus to the nature and extent of the actual possessor's use of the disputed property and whether that use is sufficient to put a reasonable owner on notice of the hostile activity and thus

---

[9] The motion judge concluded that AM satisfied the rule of Turner's Falls and Johnson because, based upon the topography of the strip, located significantly below the grade of the balance of the J&W property and on nearly the same grade as the AM property, as well as a clause in the lease that required IGF to keep the leased premises in a clean and sanitary manner, it could be implied that the landlord had claimed title to the strip and intended it to be included under the lease. Given our ruling, that issue is moot.

afford the owner an opportunity to act to vindicate his or her rights. Ottavia, 338 Mass. at 333-334.

Here, therefore, the focus is not on whether the landlord had possession of the strip, claimed title to it, or included it in the lease to IGF. Rather, the focus is properly on the nature and extent to which IGF used the strip and whether that was sufficient to put a reasonable owner of the J&W property on notice. The undisputed facts in the record establish that, irrespective of IGF's landlord's actual state of mind or intent, IGF used the strip "as the average owner would use it," Kendall, 413 Mass. at 624, throughout the tenancy, without the consent of J&W, the true owner. IGF's use was such that it should have come to the attention of the owner of the J&W property.

Of course, the tacking analysis does not end there, because privity between AM and IGF, as well as between AM and IVA is also required. See Shoer, 337 Mass. at 424. "To produce the necessary privity [for tacking of successive periods of adverse use] there must be some relation between the successive users of such a nature that the use by the earlier user can fairly be said to be made for the later user, or there must be such a relation between them that the later user can be fairly regarded as the successor to the earlier one. Am. Law of Property, § 8.59." Ryan, 348 Mass. at 264. As an initial matter, we note that J&W has not challenged whether privity exists between AM

and the other two entities. Nor could it. AM, IGF, and IVA were all formed by Zelfond and were connected, as either landlord or tenant, with the operation, or preparation to operate Bazaar on the AM property for more than twenty years. As matter of law, therefore, privity exists.

b. Exclusivity of possession of the strip. J&W also argues that there is a genuine dispute as to whether AM and its predecessor, IGF, maintained exclusive possession of the strip throughout the required twenty-year period. J&W makes two claims. First, J&W claims that IGF's earliest uses of the property were not sufficient to support a claim of adverse possession. We disagree. The summary judgment record amply supports IGF's use of the property commencing in August, 1993.

Second, J&W argues that exclusive possession of the strip was interrupted by activities of J&W's property manager from 1998 to 2011. However, "[n]ot every act by the owner on the land interrupts actual adverse possession." Rothery v. MacDonald, 329 Mass. 238, 241 (1952). "To stop the running of the [prescriptive period], the owner's entry, with few exceptions [not applicable here], must be done openly on the land, so as to give notice of the interruption." Pugatch v. Stoloff, 41 Mass. App. Ct. 536, 541-542 (1996). Even accepting that the J&W property manager actually stepped onto the strip

when he conducted his inspections,[10] these inspections were so infrequent and innocuous that they cannot be deemed to have put AM or its predecessor on notice that the owner of the J&W property was purporting to exercise dominion and control over that disputed piece of property.[11]  In fact, the evidence shows that no one connected with the AM property ever saw the J&W property manager conduct these inspections.  J&W's claim of error, therefore, cannot be sustained.

In sum, as detailed above, beginning in August, 1993, and continuing for more than twenty years thereafter,[12] AM and its predecessor engaged in significant and continual activity on the strip.  The activity was both inconsistent with the rights of the owners of the J&W property and consistent with a claim of dominion and control over the strip by AM and its predecessor.  The activity was open and notorious and sufficient to put all of the world, including the owners of the J&W property, on notice

---

[10] During his inspections, the J&W property manager usually did not venture much further than the set of stairs that lead down to the strip.

[11] With respect to the cleaning company the J&W property manager hired to occasionally "police" the strip for trash, even if we infer that the cleaning company employees actually went on the strip, despite the lack of direct evidence to that effect, such activity was so infrequent as to be immaterial.  See note 6, supra.

[12] It is immaterial whether one instead uses September 27, 2013, the date of the filing of AM's complaint, as the trigger date for calculating the twenty-year period.

of the nonpermissive use.  Based upon the undisputed facts,
therefore, AM established the necessary elements for adverse
possession of the strip.

2.  J&W's adverse possession of the passageway.  J&W argues
that the judge erroneously granted summary judgment in AM's
favor on J&W's claim of adverse possession of the passageway.
Specifically, J&W contends that the judge erroneously concluded
that J&W had "offered no evidence suggesting any adverse use of
the [p]assageway . . . prior to 1999."  J&W relies on the
testimony of its property manager to the effect that cars were
parked within the bounds of the passageway both before and after
the parking space lines were painted on the parking lot in 1999.
As noted previously, the property manager's tenure spanned 1998
to 2011 only.  As a result, he could not provide testimony as to
what transpired at the J&W property and parking lot prior to
that time.  J&W further notes that the parking lot has been
licensed for sixteen parking spaces since at least June, 1993.
That does not establish, however, that the spaces were
configured in a manner that caused cars to block the passageway
prior to 1999.  Absent such evidence, J&W is unable to establish
adverse use of the passageway for the requisite twenty-year
period.  The claim for adverse possession of the passageway,
therefore, fails as a matter of law.

Judgment affirmed.