**SHELL OIL CO., Inc., et al. v. STONE et al.**

No. 5794.

Court of Civil Appeals of Texas. Texarkana.

April 24, 1941.

Rehearing Denied May 1, 1941.

R. H. Whilden, of Houston, W. H. Sanford, of Dallas, Y. P. Broome, of Tulsa, Okl., Lacy & Price, of Longview, and Conan Cantwell, of Dallas, for appellants.

Saye & Saye and Harrington & Harrington, all of Longview, and Henry H. Brooks and Richard S. Brooks, both of Austin, for appellees.

JOHNSON, Chief Justice.

This suit was filed by J. M. Stone and Guthrie Cobb (joined by her husband, Leugene Cobb, whom she divorced prior to the trial) as plaintiffs, against Shell Petroleum Corporation (whose name was subsequently changed to Shell Oil Company, Inc., and is referred to as the Shell), Tidewater Associated Oil Company (referred to herein as Tidewater), Thelma Mae Bell and Edward Bell as defendants, in trespass to try title to a strip of land containing 1.04 acres, in the J. Mosley survey in Gregg County. The south line of the strip is about 1,250 feet long and coincides with the south line of the Mosley and the north line of the C. H. Anderson survey. The north line of the strip is oval shaped, making the strip about 85 feet wide in the middle and coming to a point at each end. Plaintiffs specially pleaded the 10 years' statute of limitation. Defendants Thelma Mae Bell and Edward Bell were not served with citation and the suit was dismissed as to them. Defendants Shell and Tidewater filed answers containing general denials, pleas of not guilty, and cross actions seeking to recover the oil and gas leasehold estate in the 1.04-acre strip. Guthrie Cobb and Leugene Cobb filed answers to said cross actions, consisting of pleas of not guilty. Upon trial of the case, at the conclusion of the evidence, defendants filed motions for a directed verdict which were overruled. The cause was submitted to a jury upon two issues, which, together with the jury's answers thereto, read as follows:

"No. 1: Do you find from a preponderance of the evidence that Guthrie Cobb, either in person or through a tenant has had and held peaceable and adverse possession of the land in controversy, using or enjoying the same for any continuous period of ten years after May 1921? Answer Yes or No." Answer: "Yes."

"No. 2: Do you find from a preponderance of the evidence that during any consecutive period of ten years after May 1921, the land in controversy, together with a part of the Guthrie Cobb fifty acre tract was continuously enclosed within a substantial fence entirely surrounding such

land, and capable of retaining and excluding cattle of ordinary disposition? Answer Yes or No. Answer: "No."

The defendants filed motions asking the court to disregard the jury's answer to special issue No. 1 and to enter judgment for them notwithstanding the verdict. The motions were overruled and judgment was entered for plaintiffs for title and possession of the land in controversy. From an order overruling their motions for new trial, defendants have appealed.

Appellants, among other assignments of error made by them, complain of the action of the trial court in overruling their motions for a directed verdict, and motions to disregard the jury's answer to special issue No. 1, and to render judgment for them notwithstanding the verdict of the jury.

The evidence shows that prior to 1904, Jones Moore acquired title to all the J. Mosley survey, referred to as containing 160 acres. In 1907 Moore built a fence along his south line, except at the place here in question, at which place the fence curves to the north around a "swag" or "draw", because the marshy land made it difficult to build the fence in a straight line, thus leaving the 1.04-acre strip of Moore's land outside his fence. In 1930 the heirs of Jones Moore (who had died intestate) executed an oil and gas lease covering all the J. Mosley survey, except about twenty acres in the north portion and not material in this suit. The east fifty acres of said leasehold estate was assigned to the Shell and the west ninety acres to the Tidewater. The division line running north and south between the leasehold estates of Shell and Tidewater places a portion of the 1.04-acre strip in the southwest corner of Shell's lease and a portion in the southeast corner of Tidewater's lease.

In 1918 Sam Jones acquired title to a 50-acre tract of land out of the north part of the C. H. Alexander survey, which 50-acre tract has for its north, east and west lines, respectively, the north, east and west lines of said Alexander survey. The 50-acre tract calls to run 950 varas east and west and 300 varas north and south. A public road runs through the 50-acre tract, near the center, in the general course of north and south, thus dividing it into what will be termed the "West half" and the "East half" of the 50-acre tract. The 1.04-acre strip in controversy in the J. Mosley survey lies immediately north of the West half of the Sam Jones 50-acre tract in the Alexander survey. The East half of the 50-acre tract was enclosed by a fence and in cultivation when Sam and his wife, Guthrie Jones (appellee Guthrie Jones Cobb) moved on the land in 1918. The residence is in the southwest corner of the East half. The barn and a horselot are located immediately across the road, west of the residence. The West half, except the horselot, was unenclosed woodland when purchased by Sam. After his purchase Sam built a small hog pasture consisting of a strip running immediately west of the road and north of the horselot, joining Moore's fence on the north. J. A. Whittaker owned the land south of the 50-acre tract. Whittaker fenced his north line. Sam built a three-wire fence along the west line of his 50-acre tract, joining the Moore fence on the north and the Whittaker fence on the south, thus enclosing the West half of the Sam Jones 50-acre tract. There was no fence along the south line of the 1.04-acre strip, but it became surrounded by the same fence lines above mentioned as surrounded the West half of the Sam Jones tract. Sam Jones owned seven or eight head of cattle, more or less, one mule and one horse. During each year from planting time in March until the crop was harvested, usually in October, Sam would pasture his cattle in the West half of his land, and after the crops were gathered he would pasture them in the field on the East half. When being pastured in the West half, the cattle would occasionally range across Sam's north line and upon the 1.04-acre strip in question. There was a seep-spring on the strip that produced water in rainy seasons. At different times witnesses saw Sam's cattle drinking from this spring and grazing on the strip. Sam died in May, 1921. In 1930 Guthrie Jones and the children of Sam Jones executed an oil and gas lease covering the 50-acre tract. This lease was subsequently acquired by Shell. There is no testimony showing, or any contention made, that Sam Jones claimed the 1.04-acre strip. On the other hand, Guthrie testified that Sam pointed out to her the northwest and northeast corner trees and the whole north line of the 50-acre tract. The north line of the 50-acre tract does not include the 1.04-acre strip. Guthrie's contention is that she acquired title to the strip under the 10 years' statute of limitation, R.C.S., Article 5510, in her own right during the 10-year peri-

od (1921-1931) immediately following Sam's death, by adverse claim set up and asserted by her only through use of the same character of alleged possession as held by Sam during his lifetime. Except for one year (1928) during the 10-year period following Sam's death, Guthrie lived on the 50-acre tract, farming the East half and pasturing the West half in the same manner as used by Sam during his lifetime. She sold some of the cattle after Sam's death, but she had at least one cow and one mule all the time. There is testimony to the effect that at times during said 10-year period the cattle were seen grazing on the land in question and at other times were seen drinking from the above-mentioned spring. Guthrie also testified that she sold tie timber from her land several times; that she did not remember the dates; that the men cutting the timber cut some trees off the strip in question; that she did not tell them to do so, but she saw the trees after they were cut.

But the testimony unquestionably shows that there was a break of approximately one year (1928) during the 10-year limitation period that neither Guthrie nor any one for her held possession, or exercised the alleged use, of the 1.04-acre strip. Guthrie moved to Houston and rented the farm to "Uncle Joe Mann" for the year 1928. Guthrie testified that she did not remember whether it was 1928, 1929, or 1930, but she admits that it was during one of those years that she stayed in Houston for eleven months and that for the year she lived in Houston she had the farm rented to Joe Mann, and that he lived on the place and farmed it. Joe Mann fixes the date as the year 1928. During the year that Guthrie lived in Houston she owned one cow and one mule. She testified that while living in Houston her cow was kept by Reuben Bell on his place, and the mule was kept by Tom Thurmand on his place, both of which places were different tracts of land from her farm. Reuben Bell and Joe Mann testified to the same effect. There is no testimony that Guthrie's tenant, Joe Mann, ever had possession of or in any manner used the strip in controversy. Joe Mann testified that he owned two mules and one cow, which he kept in a little pasture that he built near the road, because there was "no fence" on the west side of the 50-acre tract; that when his stock got out of the little pasture which he built for them near the road, they would go across the woodland and off the Guthrie Jones place at the west side where there was no fence, and would wander "clear down to the flagpond lake," which is about 1½ mile from Guthrie's farm. This testimony is undisputed.

So, it affirmatively appears without dispute in the testimony that the land in controversy was not enclosed with a fence sufficient to retain cattle of ordinary disposition, nor was it in any manner used by Guthrie Jones or her tenant during the year 1928. We think that this break (existing for at least eleven months) in the continuity of Guthrie Jones' claimed possession must be held to have been for an unreasonable length of time, and is fatal to her claim of title under the 10 years' statute of limitation. R.C.S.1925, Article 5510; Hardy v. Bumpstead, Tex.Com.App., 41 S.W.2d 226, 76 A.L.R. 1488; 2 T.J. 154, Sec. 81.

The judgment of the trial court will be reversed and judgment here rendered that appellees take nothing by reason of their suit, and that appellants recover the oil and gas leasehold estate in the land in controversy on their cross action.