[Civ. No. 15823.   Second Dist., Div. Three.   Nov. 14, 1947.]

H. WALLACE MURRAY et al., Respondents, v. OSCAR K. FULLER et al., Appellants.

Robert Wanamaker and Jacob Chaitkin for Appellants.

Cutler & Cutler for Respondents.

SHINN, Acting P. J.—Defendants Oscar K. Fuller and wife appeal from a judgment declaring that plaintiffs H. Wallace Murray and wife are the owners of an easement for right of way over a strip of land approximately 7 feet wide along the west boundary of defendants' lots in the city of Pasadena, and ordering defendants to remove an obstruction which they have placed thereon. The findings which are the basis of the judgment read as follows: "That said strip of land has been used as a driveway for ingress and egress from the rear of Plaintiffs' property to Orange Grove Avenue by Plaintiffs and Plaintiffs' predecessors in interest for more

than twenty-three years; that said use by the Plaintiffs and their predecessors in interest was without asking or receiving permission of any person and without opposition from the Defendants or their predecessors in interest. That such use by the Plaintiffs and their predecessors in interest was open, continuous, notorious and adverse to the Defendants and their predecessors in interest.''

Defendants' property is located at the northwest corner of Lake Avenue, a north and south street, and Orange Grove Avenue, an east and west street. It has a frontage on Lake Avenue of 87.11 feet and on Orange Grove Avenue of 133 feet. Plaintiffs' property, which adjoins on the north, is of the same depth and has a frontage on Lake Avenue of 42 feet. The Lake Avenue frontage of both properties is improved with brick store buildings. Plaintiffs' building has a depth east and west of approximately 50 feet and the portion lying west of the store building is unimproved except for a small garage building in the northwest corner. One of defendants' buildings covers the entire Lake Avenue frontage and extends to the west 83 feet; west of that is another brick building which extends to within 6.94 feet of defendants' west boundary and about 50 feet north from Orange Grove Avenue. Plaintiffs, therefore, have an unimproved area approximately 42 x 80 feet to the west of their building and defendants have a courtyard, approximately 30 x 50 feet unimproved except for a small building in the northeast corner. Since the entire Lake Avenue frontage of both parties is improved, there is no means of access from Lake Avenue to the areas above described except through the store buildings, and from Orange Grove Avenue along defendants' unimproved strip at the west boundary.

The court received evidence that the strip had been used by plaintiffs and their predecessors, and also by their respective tenants. Defendants claim insufficiency of the evidence to support the quoted findings and they argue (1) that the evidence as a whole failed to prove the elements of prescriptive right, (2) that the use by the owners themselves was insufficient, and (3) that the use by the tenants did not inure to the benefit of the owners.

The present case is no exception to the rule that the sufficiency of adverse possession or use to create a prescriptive title depends upon the particular facts and circumstances of the case in hand. The conclusions upon which the present

judgment rests are therefore primarily conclusions of fact. The evidence was not conflicting upon the main issues but in some respects was open to conflicting inferences. We have concluded that the evidence, and the obvious inferences to be drawn therefrom, fully support the findings.

In 1923, plaintiffs' lot was improved with a two-story dwelling house set well back from Lake Avenue, the frontage being then unimproved. In that year a store building was erected covering the entire frontage except for a strip about 3 feet wide between the building and the north line of the lot. Prior to 1927, the dwelling house was moved from the lot, and in 1927, a building was erected on the lot immediately to the north. The passageway was thereafter enclosed within the building on plaintiffs' lot. The stores in the several buildings of the parties were leased from time to time and were occupied by many different tenants. For convenience, we will refer to the tenants of plaintiffs' stores as plaintiffs' tenants, and those of defendants' stores as defendants' tenants, although there were changes of ownership of the two properties. Prior to 1936, the land of Horemian, lying immediately west of the properties of the parties, was unimproved and unfenced along its east boundary. From 1923 to 1936, vehicles or pedestrians crossing defendants' property to enter either of the courtyards above described were not confined to the property of defendants but could also use the necessary portion of the land of Horemian. In 1936, Horemian constructed a fence along the dividing line between his property and that of plaintiffs. It extended also along Horemian's east line to a point a short distance south of plaintiffs' south line. The remainder of the Horemian east line remained unfenced, and defendants were able to use the driveway as it had theretofore been used for the purpose of entering their courtyard. But, since the west wall of defendants' building was taken as the approximate east line of the established driveway all the way across defendants' property, the easement was given the same width, namely, 6.94 feet at the north corner of defendants' building, and 6.97 feet at plaintiffs' south line. We have not been advised as to when the buildings were constructed on the property of defendants, but from the testimony we would judge that it was prior to 1923. Before the Horemian fence was constructed there was ample room for trucks and other motor vehicles to use this so-called alley as a means of access to the courtyards of both properties. In 1923 and thereafter there

was a well-defined road across defendants' property to and upon the property of plantiffs. The property now owned by defendants was owned in former years by a Mr. Grund. He was described as a very agreeable person. He built a large incinerator on the rear of his lot which he allowed plaintiffs, his own and plaintiffs' tenants, to use freely. He allowed automobiles to be driven through the drive to a garage on plaintiffs' property and to be parked in plaintiffs' courtyard. He allowed his own tenants to use the drive in order to park their cars in the garage on plaintiffs' property and he allowed the predecessors of plaintiffs and their tenants to use the drive freely in going to and from their property. Such uses by plaintiffs and their tenants were frequent and uninterrupted, that is to say, the drive was used whenever occasion arose to reach the rear of plaintiffs' property. One tenant, who ran a cleaning establishment in one of plaintiffs' stores, used it frequently and regularly for many years in taking loads of clothing to and from his place of business. He occupied one or another of the stores for 15 years and regularly parked his car in plaintiffs' courtyard. Charles Penz, a former employee of Mr. Grund and who worked for him from 1925 to 1931, described the use that was made of the driveway as "neighborly like. It was open range. Everybody used it." Two of Mr. Grund's tenants parked their cars on plaintiffs' property in plaintiffs' garage building for a couple of years prior to 1936; one of them put up a small lean-to on plaintiffs' property and rented it from plaintiffs' predecessor. Access was over the driveway as usual. A witness who had been a tenant of one of plaintiffs' stores for 10 or 11 years, commencing in 1923, used the driveway and parked his car in the rear of his store daily, and he did this with the knowledge and implied consent of Mr. Grund. He moved the garage on plaintiffs' property so he could drive straight into it. Another of plaintiffs' tenants used the driveway every day from 1937 to 1942, and parked his car on the rear of plaintiffs' lot, and yet another used it in like manner until late in 1944. Plaintiffs' property was acquired in 1923 by a Mr. Hopp, and title passed to his son-in-law, a Dr. Blahnick, in 1933. Dr. Blahnick testified that he was living in the residence on plaintiffs' property from 1924 until 1927 when it was moved off the lot, and that people coming to see him would use the driveway. He testified that "they used to drive into our place. Everybody parked in back. It was a kind of community street back

there. Everybody used that. Everybody used the incincerator''; that after he moved away he returned to the property over the driveway several times a month just to look it over; that he was on very friendly terms with Mr. Grund but had never asked him for permission to pass over his property, although Grund knew he was using it, explaining, ''we just went through there like the rest of them.'' He also testified that from 1924 on, he had been familiar with the property, that he had collected rents for his father-in-law from 1924 on, and had always used the driveway when he had occasion to drive a car to the rear of the property. This he did frequently up to 1936; his son used the driveway regularly once or twice a month when he would go there to clean up the lot. Upon one occasion when the son was doing some painting he used the driveway daily for a period of some weeks. There was evidence of other similar uses of the property by plaintiffs and their tenants. It is unnecessary to state the testimony in further detail.

The evidence as outlined was sufficient to show that over a 23-year period the driveway in question was used uninterruptedly and continuously by plaintiffs, their predecessors in interest, and their several tenants, whenever there was occasion to reach plaintiffs' property by motor vehicle.

Defendants attack the finding that the use of the driveway was adverse to defendants and their predecessors and they claim that the evidence shows at most a permissive use by plaintiffs and their tenants without any claim of right. The argument is clearly without support in the facts. There was no evidence that permission was ever asked or given. It might have been inferred that the driveway was used before the buildings on plaintiffs' lot were constructed, and that plaintiffs' predecessors were using it as a means of access which rendered it unnecessary for them to provide an entrance to the rear of their property from Lake Avenue. It scarcely seems reasonable that they would have constructed their building with no driveway from Lake Avenue if they had believed that their use of the driveway was under permission which might be terminated at any time at the will of defendants' predecessor. There was ample evidence that their use of the driveway was adverse and under a claim of right.

Defendants analyze the evidence of the user by plaintiffs and their predecessors apart from user by the tenants, and contend that it was insufficient to establish any right. They are

in error, however, in contending that the use by the tenants did not inure to the benefit of the landlords, and that evidence of such use should be disregarded. Plaintiffs' claims were based upon use by the owners and the tenants as well; this was the case that was decided, and it would be unnecessary to consider the use that was made of the driveway by the owners alone, unless the use by the tenants should be disregarded.

The use of the driveway by plaintiffs and their predecessors and their tenants without express permission amounted to trespass and afforded grounds for legal redress in favor of defendants' predecessors, and it was therefore sufficient to initiate a prescriptive title.

While it is well-settled that a tenant cannot originate adverse user in his landlord's favor, when his lease does not expressly or impliedly include the easement (28 C.J.S., 643, § 8; *Holmes* v. *Turner's Falls Lumber Co.*, 150 Mass 535 [23 N.E. 305, 6 L.R.A. 283]; *Bayne* v. *Brown*, 60 Ore. 110 [118 P. 282]; *Umhau* v. *Bazzuro*, 133 F.2d 356; *Capps* v. *Merrifield*, 227 Mich. 194 [198 N.W. 918]; *Deregibus* v. *Silberman Furniture Co.*, 121 Conn. 633 [186 A. 553, 105 A.L.R. 1183]),

it is also settled that the user by the tenant does inure to the landlord's benefit if it is under a lease which expressly or impliedly includes the easement. (*Holmes* v. *Turner's Falls Lumber Co.*, *supra*; *Deregibus* v. *Silberman Furniture Co.*, *supra*; *Deregibus* v. *Silberman Furniture Co.*, 124 Conn. 39 [197 A. 760]; *Holtzman* v. *Douglas*, 168 U.S. 278 [18 S.Ct. 65, 42 L.Ed. 466].)

We believe it is scarcely open to doubt that the right to use the driveway by plaintiffs' tenants was implied in all the lease arrangements with tenants who had automobiles or who had other uses for the driveway. The privilege of parking in the rear of the stores was enjoyed by the tenants. It was of substantial benefit to them, and they parked their cars in the rear of their stores instead of on the street, not on rare occasions, but daily, and for a period of many years. They could not have done this without making use of the driveway. There was no evidence of an express agreement between the owners and the tenants with respect to the use of the driveway, but the well-traveled road was there, the owners were using it, and it was reasonable that the parties should take it for granted that the tenants would also have the right to use it. The evidence was sufficient to show an implied agreement with plaintiffs' several tenants that they might use the

driveway. For this reason the use by the tenants would inure to the benefit of the landlords.

We are also unable to agree with the contention that the use was initiated by the tenants. The evidence was that the driveway was being used by the owners when the tenants first began using it, and the inference would be that the owners began using it some time before they constructed their building. The tenants we have referred to specifically, who parked their cars on the lot, went into possession of their respective stores in the year following the completion of the stores. They found the driveway in use by the owners and they continued to use it along with the owners. There were altogether some 18 tenants in plaintiffs' stores during the period in question. Successive leases made to them with the knowledge on the part of the owners that it was the common practice to use the driveway and without objection to such use by the tenants, would certainly have involved the owners in trespasses by the tenants upon defendants' land. The use of the driveway benefited the owners in that it made their stores more accessible and desirable, and they could not have been heard to say that they had not encouraged and invited the use of the driveway by their tenants. Therefore, the use by the tenants was, in law, use by the landlords, and for the purpose of establishing a prescriptive right, inured to the benefit of the latter. (*Bernstein* v. *Dodik,* 129 Cal.App. 454 [18 P.2d 983].)

A further contention of defendants is that the customary use of the driveway was wholly terminated by the construction of the Horemian fence and that the use that had been made prior to that time was not to be considered as any part of the prescriptive term. We cannot accept this view. The Horemian fence only shut off use of a part of the Horemian property. The driveway continued to be used for the passage of motor vehicles, although trucks that had formerly come to defendants' south line, or vehicles exceeding the width of the easement, could no longer pass through. There was no abandonment of the original easement, only a withdrawal of a part of the Horemian land that had formerly been used.

It is finally argued that defendants' property, for a number of years commencing with 1936, was owned by a bank which was not shown to have had any actual knowledge of the use that was being made of the driveway. Title to the easement was well-established before 1936. Under the circumstances, it is immaterial that there was no direct proof as

to actual knowledge of the bank as to the uses that were being made of the driveway during the period 1936-44.

The judgment is affirmed.

Wood, J., and Vallee, J. pro tem., concurred.

A petition for a rehearing was denied December 12, 1947, and appellants' petition for a hearing by the Supreme Court was denied January 12, 1948.