Herman L. SANDERS et al., Appellants,

v.

M. H. WORTHINGTON, Appellee.

No. 3538.

Court of Civil Appeals of Texas.

Eastland.

May 26, 1961.

Rehearing Denied Sept. 8, 1961.

Cook & Millan, Shapiro & Corman, Houston, for appellant.

Jesse A. Pardue, Williams, Lee & Lee, Joseph W. Cash, Houston, for appellee.

COLLINGS, Justice.

M. H. Worthington brought this suit in trespass to try title against Nancy W. An-

derson and her tenant, Herman L. Sanders. A cross action in trespass to try title was filed by Mrs. Anderson and Gelta Realty Corporation, the latter as intervenor and holder of an option to purchase the land from Mrs. Anderson. The trial was before a jury and special issues were submitted bearing upon the questions of boundary and limitation. On findings of the jury favorable to Worthington on the boundary issues, the trial court disregarded findings in favor of the defendants on issues of limitation and rendered judgment for the plaintiff, M. H. Worthington. The defendants and cross plaintiffs have appealed.

The land sought to be recovered by appellee Worthington was a strip within the enclosure of the appellants, Nancy Anderson and Herman L. Sanders, described in appellee's petition as 43.90 acres within the W. H. Gentry Survey and 50.62 acres within the Francis Fry Survey. In the pleadings of appellants, Nancy W. Anderson and Gelta Realty Corporation, the land is described as and is contended to be a part of section 55, Block 3, of the Houston and Texas Central Ry. Survey. Appellants claimed that the strip was not included within the boundaries of the Gentry and Fry Surveys as originally laid out on the ground, but the jury found against this contention. Appellants claimed in the alternative that if the land was included within the Gentry and Fry Surveys that they were still entitled to recover because they had title under the 3, 5, 10 and 25 year statutes of limitation. The jury found against appellants on the 25 year statute but found in their favor on the 3, 5 and 10 year statutes. The trial court held, however, that appellants failed to prove limitation under any of the statutes and entered judgment for appellee on the verdict notwithstanding the findings on the 3, 5 and 10 year statutes.

The record consists of a transcript, supplemental transcript, a statement of facts in five volumes and numerous exhibits.

The facts material and necessary to an understanding and determination of the questions presented are set out as briefly and in as condensed form as possible. Two sets of senior surveys are involved which do not tie to each other. Laid in from east to west were the Egbert, Dement, Clarkson, large Wood, small Wood, Jones, Gentry, large Fry, Rice and small Fry Surveys. The Clarkson, Egbert and Dement ⅓ leagues are a three survey block and were surveyed by Henry Trott on September 21 and 22, 1838. Next were the two Wood Surveys made by Henderson in March, 1840, followed by the W. H. Gentry and W. M. Jones Surveys by Bringhurst on August 3, 1845. Bringhurst also surveyed the Rice, the large Fry and the small Fry on May 27, 1847, which was the last surveying on this group of senior surveys. At the opposite end of the map are the William Francis and the Bowman Surveys. These two groups of surveys do not call to adjoin and do not adjoin.

Subsequently, in 1875, surveyor C. E. Davis laid in H. & T. C. Section 55, calling for it to begin at a stake 330 varas north of the southwest corner of the Rice Survey; to go north with the west lines of the Rice, large Fry and Gentry Surveys to Section 55's northeast corner; thence west to the Francis, and then on counterclockwise with the Francis and Bowman to the point of beginning. The east-west location of the point of beginning is the hub of the controversy on the boundary issue.

Appellants deraign record title to Section 55, H. & T. C., through W. I. Williamson and wife, Rebecca, and their son, H. Turner Williamson. The defendant, Mrs. Nancy Anderson, is the widow and devisee of H. Turner Williamson. Appellee Worthington is the record owner of the Gentry and Fry Surveys which are east of and adjacent to appellants' Section 55. The following sketch shows substantially the relative positions of the surveys and points of contention involved in this appeal.

The controlling question concerning the boundary issue involves the east and west location of the west line of the Rice, the W. H. Gentry and large Francis Fry Surveys. The jury found (1) that the northwest corner of the Clarkson Survey is at point A on the map and (2) found the west lines of the Gentry and large Fry Surveys to be the line "6 through 5 to 9" as shown on the map. These findings, if supported by the evidence, determine the boundary question. Appellants urge that the court erred in refusing to disregard such findings and in failing to grant their motion for an instructed verdict. Appellants contend that appellee Worthington's theory of the case on the boundary question which was submitted to the jury and carried into the judgment is erroneous as a matter of law and contrary to the undisputed facts. Appellants urge that admissions of the parties and documentary evidence show that the answers to both special issues numbers 1 and 2 were contrary to and without support in the evidence.

The evidence shows that the north and south positions of the Charles Clarkson Survey and the surveys tied to it are not in question. The north and south position of the beginning point and south line of appellants' Section 55 as contended by all parties and as shown by the testimony of their witnesses and the fencing thereon is the same and is likewise not in question. It is the east and west location of the east line of Section 55 and the west line of the large Fry, the Gentry and the Rice Surveys which is in controversy. According to its description as already indicated, Section 55 "begins at a stake 330 varas north of C. S. Rice's southwest corner", then runs north 3193 varas with the west lines of the C. S. Rice, F. Fry and W. H. Gentry Surveys. Thus Section 55 is tied by its field notes to the Rice, Fry and Gentry Surveys, and the east line of Section 55 runs with, and so far as it goes, is identical with the west line of the Rice, Fry and Gentry Surveys. The Rice, the large Fry and the small Fry Surveys are tied to the Charles Clarkson

Survey by their field notes. The large Fry runs from its southeast corner north 324 varas along Clarkson's west boundary line to Clarkson's northwest corner (point A on the map) "a stake in prairie in the south boundary line of Wood's 640 acres Survey". The small Fry lies south of the large Fry, east of the Rice, and begins at the southeast corner of the large Fry on the west boundary line of the Clarkson. The east boundary line of the small Fry as described in the last call of its field notes lies along the west boundary line of the Clarkson 1500 varas south from the place of beginning, which places the southeast corner of the small Fry 1824 varas south of the Clarkson northwest corner (A) and 1064 varas north of the Clarkson southwest corner. (52)

The field notes of the Clarkson Survey locate its southeast corner "beginning at a stake and mound in prairie, on Dement's north boundary line, 215 varas east of a branch or prong of White Oak Bayou." The southeast corner of the Clarkson (point C on the map) is located on the ground in accord with this locative call 215 varas east of the Bayou. Two surveyors so testified. From this southeast corner the Clarkson is on the ground with its northwest corner at "A" according to its field notes, to general reputation and to ancient and and present ownership. The western boundary line adjoining the small Fry Survey is fenced in accord therewith and the evidence is to the effect that the owners involved have never had any controversy over the lines between their properties. The southeast corner of the Clarkson together with the northwest corner and the northeast corner of that survey were pointed out by witnesses who testified that such corners were "generally known with us around here that those are the corners of the Survey."

The witness Schaeffer testified that he was at the time of the trial living on the Clarkson at the place known as the Fraser place; that he knew William A. Fraser,

one of the partners in Fraser & Lapham; that both Fraser and Lapham were dead; that he had worked for both Mr. Lapham and for Mr. Fraser and looked after the Fraser farms on the Egbert, McNaughton and Clarkson Surveys; that in 1936 Laphan showed him the corners of their land in the Clarkson Survey; that he pointed out the northwest corner of their lands and the northwest corner of the Clarkson Survey where there was an iron pipe and a big cedar post; that at that point there was a fence running east and west and another fence running south between the Fraser & Lapham land and the Tucker land in the Fry Survey. The witness Spencer testified that he had known the Clarkson Survey since 1915 and that from the time he first knew it the north boundary line was fenced west to the northwest corner at point A as shown on the map. He also testified that during that same year he had pointed out to him the northeast, southeast and southwest corners of that survey; that they were then located on the ground as they are today at points B, C, and 52 as shown on the map. The witness Frank Tucker testified that he is the son of Mrs. Fannie Tucker, age 83, who with her children own land in the Francis Fry Survey just west of the Clarkson, separated by a fence which runs along the west line of the Fraser and Lapham land; that the northeast corner of his land is near a big pond that is about 100 feet south of the corner of the Clarkson northwest corner and Fry northeast corner which are located at point A as shown on the map; that from this common corner a fence runs east and west and south; that the generally and well recognized northwest corner of the Clarkson is identical with the northeast corner of his mother's land, and the fence located on the well known and generally recognized west line of the Clarkson marks the dividing line between the Tucker and the Fraser land, and there has never been any disagreement between the two families concerning this boundary.

■ We cannot agree with appellants' contention that appellee's basic theory is erroneous and that the answers of the jury to special issues numbers 1 and 2 were not supported by evidence. The court did not err in refusing to disregard the finding that the northwest corner of the Clarkson is at point A as shown on the map and in using that point and the other established Clarkson corners and boundaries as a basis for the location of the west boundary lines of the Rice, large Fry and Gentry Surveys. Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565; Stover v. Gilbert, Tex.Com. App., 112 Tex. 429, 247 S.W. 841; Kirby Lumber Co. v. Adams, Tex.Com.App., 93. S.W.2d 382; 9 Tex.Jur. 488, 506; 9 Tex. Jur.2d 583.

By beginning at the southeast corner of the Clarkson Survey, designated as point C on the map, and proceeding west 2,888 varas to Clarkson's southwest corner, thence north 1,721 varas along the west boundary line of the Clarkson and then proceeding west 4,585 varas, you reach the beginning point and the southeast corner of defendants' Section 55 as contended by appellee and as found by the jury. The 1,721 varas north from the southwest corner of the Clarkson along its west boundary line is the equivalent of the sum of 1,063 varas, the distance from that corner north to the southeast corner of the small Fry, the 327 varas separating the south line of the small Fry and the south line of the Rice, and the 330 varas from the southwest corner of the Rice to the southeast corner of said Section 55 as described by its field notes and shown as point 50 on the map. The 4,585 varas west from the west boundary line of the Clarkson is the equivalent of the sum of 1,505 varas, the length of the south line of the small Fry as shown by its field notes and its location on the ground, and 3,080, varas, and the length of the south line of the Rice as shown by its field notes. The calls for the lengths of the north lines of the small Fry and the Rice are the same and amount to a total of 4,585 varas as does the call for the south line of the large Fry which places the northwest corner of the Rice and. the southwest corner of the large Fry at.

point 9 on the map. The total for the calls of the north lines of the large Fry also amount to 4,585 varas, placing the northwest corner of that survey at point 5 on the map.

It is also noted that deeds of record executed by defendant's predecessors and pleadings and a judgment to which defendant's predecessors were parties also locate the two Fry Surveys, the Rice, the Gentry and the Jones Survey exactly as contended by appellee and in keeping with the findings of the jury. Appellant Mrs. Anderson by her own deed ties the Jones Survey on the ground in accord with the jury findings. In 1910, W. I Williamson, predecessor to appellants, executed deeds to A. Eiler which located the small Fry Survey exactly as contended by appellee and in accord with the findings of the jury. On January 10, 1917, W. I. Williamson, Rebecca and H. T. Williamson, predecessors to appellants, deeded to McManus the 88.1 acre tract out of the Jones Survey shown on the map between the road running north and south through the Jones and the east line of the Gentry Survey. In 1926, W. I. Williamson was a party plaintiff in a trespass to try title suit against one Pollock which involved the 88.1 acre tract. The description of the tract in the deed to McManus, in his pleadings and in the judgment in the case against Pollock locate and tie the tract to the ground exactly as contended by appellee, as shown on the map and in accord with the finding of the jury. Such instruments tie the northeast corner of the Gentry to point 8 as shown on the map, tie the west line of the Jones to the east line of the Gentry, tie the southeast corner of the Gentry and the southwest corner of the Jones to the ground at the railroad and county road at point 62, to the county road at 63, to the south line from the county road east to the road running north through the Jones at point 60, and from the southeast corner of the McManus tract at 60 north to point 61, the northeast corner of said tract.

Mrs. Rebecca Williamson and son, H. T. Williamson, after the death of W. I. Williamson, in partition conveyed to Brinen the north 85.35 acres of the Jones land east of the road, and Brinen conveyed to them the south 142.69 acres of such land. These deeds by defendants and their predecessors locate the Jones and Gentry Surveys in conformity with the findings of the jury and show the boundary line between them to be the line 8 to 63 as shown on the map. The west line of the Gentry is located by the call of its field notes 1,344 varas west of its established east line and is the line 6–5 as found by the jury. These lines and corners of the Gentry Survey as fixed by the Williamsons are tied to the railroad, the county road, the road running north through the Jones, and in harmony with the Williamson prior location of the small Fry, with the location of the west line of the Gentry and large Fry Surveys by the jury at 6–5–9 and are in harmony with the location of the northwest corner of the Clarkson at "A" as found by the jury and with the west boundary line and other corners of the Clarkson. The action by appellants and their predecessors concerning boundaries and corners of adjoining land constitute probative evidence against them in this suit. It tends to identify the beginning point of Section 55 and the west boundary lines of the Gentry and the large Fry Surveys, contrary to their contention in this case. Davis v. Mills, 63 Tex.Civ.App. 359, 133 S.W. 1064; Stafford v. King, 30 Tex. 257; 11 C.J.S. Boundaries § 112, p. 708; Texas Pipe Line Co. v. Cozart, Tex.Civ.App., 38 S.W.2d 903, (Writ Dis.); Mahoney v. Mahoney, Tex.Civ.App., 103 S.W.2d 459.

Appellants' points numbers 1 and 2 urging that the court erred in refusing to disregard the findings in answer to special issues numbers 1 and 2, and in failing to grant their motion for an instructed verdict are overruled. The evidence supports the findings of the jury that the northwest corner of the Clarkson is at point A on the map and that the west line of the Gen-

try and large Fry Surveys is the line "6 through 5 to 9" as shown on the map. Such findings are not against the great weight and preponderance of the evidence.

In appellants' points 3, 4, 5, and 6, it is contended that the court erred in granting appellee's motions to disregard the jury findings in favor of appellants on special issues numbers 3, 4 and 5 relative to the three, five and ten year statutes of limitations, and in granting appellee's motion for judgment non obstante veredicto.

■ Article 5507, Vernon's Ann.Tex.Civ. St. provides that suits to recover real estate against one in peaceable and adverse possession under title or "color of title" shall be instituted within three years after the cause of action has accrued. Article 5508, V.A.T.C.S., defines "color of title" as meaning a consecutive chain of transfers from the sovereign of the soil down to the person in possession. Appellants do not have title or "color of title" because there is no showing that the strip of land in controversy was included within their survey as originally laid out on the ground. The strip was found by the jury to be in the Gentry and Fry Surveys. The only way that it could be contained in Section 55 would be for that survey to be in conflict with the senior Gentry and Fry Surveys. The field notes of Section 55 call to begin at a stake 330 varas north of the southwest corner of the Rice Survey and to proceed north with the west lines of the Rice, Fry and Gentry Surveys and obviously does not call to conflict with those senior surveys. There is no evidence that the strip in question was included within Section 55 as originally laid out on the ground. Under these facts there can be no conflict or overlapping between Section 55 and the Fry and Gentry Surveys and appellants have no "color of title" to the strip. The court did not err in granting appellee's motion to disregard the jury finding for appellants on the three year statute of limitation. Kirby Lumber Co. v. Gibbs Bros. & Co., Tex.Com.App., 14 S.W.2d

1013; Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 104 S.W.2d 1.

Article 5509, V.A.T.C.S., provides that suits to recover real estate against a person having peaceable and adverse possession, cultivating, using or enjoying the same, and paying taxes thereon, if any, and claiming under a deed or deeds duly registered should be instituted within 5 years after the cause of action shall have accrued.

We agree with appellants' contention that there was evidence showing adverse possession of the strip in question for a period of 5 years, and that their claim is "under a deed or deeds duly registered" as required by the 5 year statute. The deed from J. R. Robinson to their predecessor W. I. Williamson purported to convey to him the land in controversy. Even though Williamson executed deeds purporting to convey the land to J. L. Boyer and Chas. Boyer, he retained vendor's liens to secure the payment of the purchase price and, therefore, remained the holder of the superior title to the strip until Section 55 was later reconveyed to him. Humble Oil & Refining Co. v. Downey, 143 Tex. 171, 183 S.W.2d 426; Luczynski v. Sevier, Tex. Civ.App., 302 S.W.2d 474, and cases cited therein.

The reconveyance to W. I. Williamson by grantees of the Boyers recited as a part of the consideration the cancellation and surrender of the vendor's lien notes executed by the Boyers. Williamson had the right to rescind his conveyance and to resume title and possession of the property. Such was the effect of the transactions involved. R. B. Spencer & Co. v. May, Tex.Civ.App., 78 S.W.2d 665, (Writ Ref.). Under the circumstances, appellants' claim to the strip in question is under the original conveyance to Williamson even though the later reconveyance to him by successors to the Boyers particularly described only Section 55 and referred to it generally as being the same land conveyed by W. I. Williamson to the Boyers.

Appellants, however, did not show title to the land in controversy under the 5 year statute of limitation because they did not show payment of taxes thereon as required by the statute. The payment of taxes shown by appellants were all on Section 55. The land in controversy lies in the Gentry and Fry Surveys and there is no showing that appellants or their predecessors ever paid taxes on any land in those surveys. This did not satisfy the requirement of the statute and that fact alone prevents the running of the five year statute. Dutton v. Thompson, 85 Tex. 115, 19 S.W. 1026; Conn v. Houston Oil Co. of Texas, Tex.Civ.App., 218 S.W. 137; Hoehn v. House, Tex.Civ.App., 31 S.W. 83. In Hermann Hospital Estate v. Nachant, Tex. Com.App., 55 S.W.2d 505, 507, it is stated as follows:

"A reading of the above statute (Art. 5509) shows that the payment of taxes is an absolute prerequisite to the acquisition of title to land thereunder. * * * Where the taxpayer pays taxes on one survey, he cannot apply such payments to land on another survey for the purpose of sustaining title under the five-year statute of limitations, and this even though such payments were made by mistake. * *

"The record before us shows that defendants paid taxes on land on lots 22 and 21, Blount subdivision of the P. W. Rose Survey. * * *

"As we understand this record, the trial court found that the 14.96 acres in dispute was no part of lots 22 and 21, supra. We further understand that the trial court, in effect, found that the plaintiffs are the record owners of the 14.96 acre tract. It follows that one of the absolute essentials of a title under the five year statute of limitations is lacking as to defendants. Such essential is the payment of taxes."

The case of Hoehn v. House, supra [31 S.W. 84], is very similar to the fact situation in the instant case. It was there stated as follows:

"* * * The extraneous evidence made it clear that Vernon intended to pay taxes on the land described in his deed, supposing it, however, to be a part of the Coryell land. But the question is, did he in fact do so? * *

"* * * we have concluded that, in paying the taxes assessed against a part of the Coryell school league 62, Vernon did not pay any taxes on the land in controversy, a part of the Mathew Dunn survey. See, also, Spence v. Johnson, [3 Tex.Civ.App., 627] 22 S.W. 1042. The case is not analogous to that of Harrison v. McMurray, 71 Tex. 122, 8 S.W. 612, where there was a conflict in the original location of the two grants. Here there was no such conflict, but only an excess in the Dunn. The judgment will be reversed, and here rendered in favor of plaintiff in error, eliminating the recovery by defendant in error Vernon, under his plea of limitation, of that part of the Dunn Survey included within the calls of his deed, and specifically described in the judgment."

The trial court, for the reasons stated, properly held that appellants did not mature limitation title to the land in controversy under the five year statute. Appellants contend in other points that there was ample evidence to support the finding of the jury in reference to the running of the 10 year statute of limitations; that under the evidence the jury could have found that the Williamsons and Mrs. Anderson through tenants were in open, continuous and adverse possession of the strip under a claim of right extending at least from the year 1919 through the year 1952.

A person seeking to establish title to land under the 10 year statute of limitation has the burden to show (1) possession of the land, (2) cultivation, use or enjoy-

ment thereof, (3) an adverse or hostile claim and (4) an exclusive dominion over the property and an appropriation of it for his own use and benefit for the statutory period. 2 Tex.Jur.2d, pages 367, 368. If the claimant fails to establish any one of the statutory requirements he has failed to make out a case. 2 Tex.Jur.2d, page 376.

■ The evidence relied upon by appellants to show possession of the land is limited to the grazing of cattle on the land. For such possession to be adverse it is necessary for the land to be completely enclosed for the purpose of such use and the enclosure must not be merely incidental and casual. De Las Fuentes v. Macdonell, 85 Tex. 132, 20 S.W. 43.

Appellants' assertion of title by limitation is based entirely upon the possession of tenants. Appellants and their predecessors were never in actual possession themselves. In this connection the evidence shows that one Beeler was the tenant of the Williamsons on Section 55 from the latter part of 1918 until sometime in 1935; that one Holt was a tenant from 1938 until 1942 and one Paddock was a tenant from January 14, 1943, until December 31, 1952.

■ The evidence relied upon to show possession by the tenant Beeler was the grazing of cattle on the land. Although he grazed cattle thereon for a period of more than 10 years, this as a matter of law does not show adverse possession for that period unless the land claimed was completely surrounded with substantial enclosures. Title by limitation cannot be acquired by grazing on unenclosed land. Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781.

■ It is undisputed that there was a break of one year during Beeler's possession in that a portion of the fence was broken and incapable of holding livestock during that time. Beeler testified, in effect, that the fence was down "probably during one year's time" while he was using the land, that it was down to "where cattle would cross over"; that it was not down for a 10 year period but was down only for a period of one year during a 10 year period that a certain employee had worked for him; but that he was unable to state at what interval in his possession this break of one year took place. The burden was on appellants to show 10 years continuous possession to comply with the statute. The above evidence fails to show possession by Beeler for any consecutive ten year period because it does not show what year the fence was down. Phillipson v. Flynn, 83 Tex. 580, 19 S.W. 136; Overand v. Menczer, 83 Tex. 122, 18 S.W. 301; Dunn v. Taylor, 102 Tex. 80, 113 S.W. 265; Shell Oil Co. v. Stone, Tex.Civ.App., 151 S.W.2d 872, (Writ Ref.).

■ Beeler's last year of possession, or of use of the land for grazing purposes was in 1935. Holt's possession of the land began in the spring of 1938. This was a skip of three years and Holt's possession could not be tacked to that of Beeler. Woods v. Hull, 90 Tex. 228, 38 S.W. 165. These possessions could not be tacked for the additional reason that Beeler was absolutely unable to fix the year that the fences were down during his possession and specifically stated that he could not recall whether it was in the early part or the latter part of the time that he grazed the land.

Appellants apparently attempt to avoid this 3 year break between the possession of Beeler and that of Holt by showing that one Paddock started using the land in controversy shortly after Beeler left and used it during the approximately three year period between Beeler and Holt. The testimony relied upon by appellants to show such possession by Paddock was that of the witness Atkins, an employee of Paddock. There was no probative evidence in the record showing any tenancy relationship during the period between Williamson and Paddock. The use or possession of

the land by Paddock can be of no benefit to appellants unless it is shown that he was their tenant or the tenant of their predecessor, and such fact was not shown. Appellants had the burden of affirmatively showing the existence of such facts concerning the use and occupancy of the land. Bowles v. Watson, Tex.Civ.App., 245 S.W. 120; Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24. They failed to meet the burden.

As previously indicated Holt had Section 55 under lease from 1938 through 1942. He abandoned his lease, however, on January 1, 1942, and moved to Waller. The Paddock cattle were again moved into the Williamson pasture on April 13, 1942, but the first lease between Paddock and Williamson was dated January 14, 1943. It is obvious from the above facts that there was a skip of one year between the end of Holt's possession and that of Paddock who succeeded him, and that the court properly refused to tack the possession of Paddock to the possession of Holt. Appellants seek to avoid this one year skip in possession by showing a tenancy relationship between Williamson and Paddock covering the period. The testimony relied upon by appellants is that of the witness Atkins, an employee of Paddock. Atkins testified that his employer Mr. Paddock instructed him to start making use of the Williamson pasture and said that it was his pasture after the 10th of January, 1942, that he had subleased it from Holt for the rest of 1942 and that after 1942 he would lease it directly from Williamson. This testimony by Atkins concerning the landlord-tenant relationship for the year 1942 was hearsay and was not evidence of probative force to show that Paddock was a tenant of Williamson during that time. Texas Company v. Lee, 138 Tex. 167, 157 S.W.2d 628; Henry v. Phillips, 105 Tex. 459, 151 S.W. 533.

As previously indicated, the first lease on appellants' Section 55 between Paddock and Williamson was on January 14, 1943, and there was no probative evidence that he occupied the land under or by virtue of a lease from Williamson prior to that time. Since his possession could not be tacked to that of Holt, any possession by Paddock prior to the date of his lease did not inure to the benefit of Williamson. The possession which Paddock had after he took charge of the land under his lease from Williamson on January 14, 1943, continued under subsequent leases until his last lease expired on December 31, 1952. This possession was for less time than the required 10 year statutory period. The trial court properly held that appellants failed to prove any 10 years continuous possession of the land.

It is contended in appellants' 7th point that the court erred in refusing to submit appellants' requested special issue number 3 as follows:

"Do you find from a preponderance of the evidence that the northwest corner of the larger Fry Survey as made by Bringhurst is not located 55.5 varas east of the fence shown on Atkinson's map—?"

Appellants urge that there was evidence to support their theory of the case that an occupied line as shown on an aerial map was the occupied east line of the Egbert and Dement Surveys, and that it could be determined that there was approximately a 312 varas excess in the scaled line over the call distances of the north line of the Dement, and that such east and west location of the Dement would have the effect of locating the Clarkson and all of the eastern tier of Surveys that distance further east of the location claimed by appellee and found by the court. This point is not well taken. No surveyor who testified claimed to have been on the ground at the so-called occupied east line of the Dement Survey as contended by appellants. No surveyor would testify to the propriety of such a location of the east line of the Dement. The existence of a single oc-

cupied line on an aerial photo is not sufficient of itself to raise a question of fact as to whether or not it was the occupied east line of the Egbert and Dement Surveys. Appellants' 7th point is overruled.

Special issue number 2 of the court's charge inquired whether a jury found the line 6–5–9 as shown on the map to be the west line of the Gentry and the large Fry Surveys. Appellants contend that the court erred in overruling their objection to the submission of special issue number 2 because it was not accompanied with an explanatory instruction on the priority of calls in field notes. The case of Swearingen v. Brown, Tex.Civ.App., 195 S.W.2d 724, 729, is in point. In that case the question of whether the trial court erred in refusing to give such a requested instruction was considered and the court held:

> "In a case of this character, where none of the objects called for in the field notes can be identified on the ground and the evidence not accounting for their absence or their previous location to that degree of certainty as to justify a court in fixing their location as a matter of law, all of such special requested instructions would have been on the weight of the testimony and would have been more confusing than helpful to the jury in determining the true location of the line inquired about."

The case of Humble Oil & Refining Co. v. Owings, Tex.Civ.App., 128 S.W.2d 67, relied upon by appellants is not controlling. It simply held that such an instruction was proper under the facts in that case. In our opinion the trial court did not abuse its discretion and there was no reversible error in refusing to give the requested instruction. Appellants' points 8 and 11 are overruled.

We also overrule appellants' points 9 and 10 urging that special issue number 2

was duplicitous in requiring the jury to determine two ultimate fact issues in a single issue, that is, the location of the west lines of the Gentry and the Fry; that special issue number 2 assumed a disputed fact, that is, that the southwest corner of the Gentry Survey and the northwest corner of the large Fry Survey are coincident. The Gentry Survey was surveyed by Bringhurst on August 3, 1845, and the large Fry was surveyed by Bringhurst on May 27, 1847. The Fry Survey calls for its northwest corner to be the southwest corner of the Gentry. There is no evidence tending to show that they were not so located. The west boundary lines of both surveys are called to be north and south. The plat on the original field notes of the Fry show that the two surveys have the same east-west position.

In numerous points appellants complain of the action of the court in holding inadmissible and in sustaining objections to certain subsequently made field notes, maps, sketches, re-surveys and reports. Illustrative of these matters and most urgently complained of, is the action of the court in refusing to admit in evidence a copy of the Mabry 1889 field notes on Section 55, offered as appellants' exhibit 2. Appellants urge that exhibit 2 was admissible to show that such field notes were identical with the field notes to the first deed to W. I. Williamson, locating in 1889 the same lines as called for by said deed in 1907, and was admissible for whatever said field notes might be worth as evidence of the location of the boundaries of Section 55. In support of this contention appellants rely upon Article 250, V.A.T.C.S., and Childress County Land and Cattle Co. v. Baker, 23 Tex.Civ.App., 451, 56 S.W. 756. The cited case held admissible such a re-survey for the sole and only purpose of enabling the jury to determine "where the original survey really placed the land". Subsequently made field notes, maps, etc., are admissible if they are in harmony with, tend to explain and

factually identify locative objects described in the senior field notes. Mabry's map and field notes call for certain objects to identify the southeast corner of Section 55, but neither these objects nor any other object called for by the Mabry were called for in either Section 55, the Rice, Gentry and Fry Surveys. It is not permissible for subsequently made maps and field notes, even though made under authority of the general land office, to change or alter surveys in such a way as to include land not included in the original survey. State v. Post, 106 Tex. 468, 169 S.W. 407; Wheeler v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149; Carmichall v. Stanolind, Tex.Civ.App., 256 S.W.2d 129, (Writ Ref.). The original surveys here involved are of long standing and the field notes of the senior surveys are harmonious and are in accord with their location on the ground. It is not permissible to change them by the conclusion or idea of a subsequent surveyor or draftsman. The subsequently made maps and field notes in question and the calls therein show no factual information tying them to the original surveys in such a way as to render them admissible for the purpose of showing where the original surveys really placed the land. Such maps and field notes do not constitute evidence of probative force tending to locate the surveys, but are merely opinions and conclusions of the surveyor or draftsman. Whitmore v. McNally, Tex.Civ.App., 39 S.W.2d 633; Weatherly v. Jackson, 123 Tex. 213, 71 S.W.2d 259. Some of the maps were private and had no dignity except as supported and verified by testimony of the maker. Maxcy v. Norsworthy, Tex. Civ.App., 19 S.W.2d 929. Appellants' points complaining of the action of the court in holding inadmissible and in sustaining objections to such subsequently made field notes, maps, sketches, re-surveys and reports are overruled.

Contrary to appellants' contention the trial court did not err in ruling that the location of the Clarkson Survey evidences and, in connection with deeds, pleadings and judgment to which appellant Mrs. Anderson and her predecessors were parties, controls the location of the Gentry Survey.

There was likewise no error on the part of the court in excluding the 1930 Beeler v. Griffith Justice Court judgment. The judgment involved possessory rights only and the question of title was not and could not have been involved. Appellants contend that the judgment was admissible to corroborate the testimony of appellants' witnesses with regard to the controversy concerning the possession of the land and the strongly adverse nature of appellants' possession. The testimony was to the effect that, by said Justice Court proceeding and judgment, Beeler recovered possession of land described as Section 55 by calls located to include all that part of the disputed strip here found to be a part of the Gentry Survey. The testimony concerning the existence of the judgment, and its authenticity was not denied or questioned by appellee. The trial court did not err in holding such judgment inadmissible.

We also overrule appellants' point number 36 urging that the court erred in refusing to grant a new trial on the ground of newly discovered evidence. There was a lack of proper diligence in that none of the information relied upon to support the claim of newly discovered evidence was secret or unavailable at the time of the trial. The affidavit of the witness Heaney indicates that during the trial he saw some old maps and field notes in which there appeared to be slight discrepancies, including a job in a right of way fence that might affect the location of the Clarkson Survey. He stated that his health and lack of time prevented him from then going on the ground to make certain measurements of the boundary lines of the Clarkson, Egbert and Dement Surveys; that since the trial his health was better and he had found time to go on the ground and in his

opinion "matters now on the ground disclose that the Clarkson Survey" as shown on the Atkinson map is incorrect. No facts stated in the affidavit would have justified the trial court in granting a new trial. In addition, the documents showing the claimed discrepancies were in the hands of appellants' attorneys during the trial and there is no showing how long prior thereto they had been in appellants' possession. Appellants have not shown the diligence required as a prerequisite for the granting of a new trial on this ground.

The judgment of the trial court is affirmed.