**Herman L. SANDERS et al., Petitioners,**

**v.**

**M. H. WORTHINGTON, Respondent.**

No. A–8659.

Supreme Court of Texas.

July 15, 1964.

Rehearing Denied and Dissenting Opinion Filed Oct. 28, 1964.

Joel W. Cook, Shapiro & Corman, Houston, for petitioners.

Jesse A. Pardue, Joseph W. Cash, Williams, Lee & Lee, Lee & Forbes, Houston, for respondent.

WALKER, Justice.

Our former opinion in this cause is withdrawn and the following is substituted therefor:

M. H. Worthington, respondent, brought this suit in trespass to try title against Mrs. Nancy W. Anderson and her tenant, Herman L. Sanders. A cross action in trespass to try title was filed by Mrs. Anderson and Gelta Realty Corporation, the latter as intervenor and holder of an option to purchase the land from Mrs. Anderson. On findings of the jury favorable to Worthington on the boundary issues, the trial court disregarded findings in favor of the defendants on the issues of limitation and rendered judgment for respondent. The defendants and cross plaintiffs appealed, and the Court of Civil Appeals affirmed. 349 S.W.2d 115. Mrs. Anderson, her tenant and Gelta Realty Corporation are petitioners here. It is our opinion that the trial court erred in disregarding the jury finding that petitioners had matured title under the ten year statute of limitation.

The following sketch will be of assistance in understanding the boundary dispute, which has some bearing on one of the limitation questions presented by the appeal:

The land in controversy is a strip about 260 varas wide within the enclosure of petitioners, described in the petition as 43.90 acres of the W. H. Gentry Survey and 50.62 acres of the Francis Fry Survey. Its corners are indicated on the map by the figures 6, 9, 4 and 12. The hub of the boundary controversy is the east-west location of the west lines of the Rice, Gentry and large Fry Surveys. Respondent is the record owner of the Gentry and large Fry, which are east of and adjacent to H. & T. C. Ry. Co. Survey No. 55, hereinafter referred to as Section 55. He contends that the strip in dispute is located in the Gentry and Fry. Petitioners insist that it is part of Section 55, which they hold by record title through and under W. I. Williamson and his wife, Rebecca. W. I. Williamson acquired Section 55 in 1907 by a conveyance which included the land in controversy. He and his wife died in 1926 and 1935, and each left a will devising all of their respective estates to their son, H. T. Williamson. The latter, who died in 1945, devised and bequeathed all of his property and estate to his widow, who is now Mrs. Nancy W. Anderson.

Two sets of senior surveys are involved which do not tie to each other. Laid in from east to west were the Dement, Egbert, Clarkson, large Wood, small Wood, Jones, Gentry, large Fry, Rice and small Fry Surveys. The Dement, Egbert and Clarkson ⅓ leagues are a three-survey block surveyed by Henry Trott on September 21 and 22, 1838. Next were the two Wood Surveys made by Henderson in March, 1840, followed by the Gentry and Jones Surveys by Bringhurst on August 3, 1845. Bringhurst also surveyed the Rice, the large Fry and the small Fry on May 27, 1847, which is the last surveying done on this group of senior surveys. The other group will be found at the opposite end of the map and consists of the William Francis and the Bowman Surveys. These two sets of senior surveys do not call to adjoin and do not adjoin.

Subsequently, in 1875, surveyor C. E. Davis laid in Section 55, calling for it to begin at a stake 330 varas north of the southwest corner of the Rice Survey; to go north with the west lines of the Rice, large Fry and Gentry Surveys 3193 varas to the southeast corner of Section 56; thence west to the Francis; and then counterclockwise with the Francis and Bowman to the point of beginning. Davis also surveyed Sections 13, 14 and 56 on the same day, but his field notes of these surveys were excluded from the jury.

The boundary controversy stems in the last analysis from the fact that there is considerable uncertainty as to the true east-west location of the Clarkson Survey, which is about two and one-half miles east of Section 55. While there is no dispute as to the location of the north and south lines of any of the above mentioned surveys, there are and have been for many years two basic and conflicting theories for placing the east and west lines of the Clarkson on the ground. The stakes and other monuments mentioned in the field notes of Trott, Henderson, Bringhurst and Davis as marking the corners of the tracts they surveyed have not been found. Respondent would place the southeast corner of the Clarkson at an iron pipe and stone in the north line of the Dement 215 varas east of the west prong of White Oak Bayou, and thus give controlling effect to one of the calls in Trott's field notes. Petitioners contend that the Dement-Egbert-Clarkson system must be reconstructed by course and distance from the southeast corner of the Dement.

The map mentioned above shows how the location of the surveys in the area are affected by adoption of each of these two theories. It also shows the occupied east and west lines of the different surveys. There is enough distance between the occupied east line of the Egbert and the occupied east lines of the Francis and Bowman to lay in all intervening surveys in

accordance with their field notes and without conflicts or overlaps if petitioners' theory for locating the Clarkson is accepted as sound. If the southeast corner of the Clarkson is placed at the iron pipe and stone as contended by respondent, there is: (1) an excess of approximately 300 varas between the occupied east and west lines of the Egbert; and (2) a shortage of approximately 300 varas between the true west lines of the Gentry, large Fry and Rice on the one hand and the occupied east lines of the Francis and Bowman on the other.

Neither of these theories has been followed consistently by those who located the present occupation lines of the various surveys in the area. Respondent's contention is supported by the generally recognized and occupational location on the ground of the Clarkson, Jones and two Wood Surveys. Petitioners' theory apparently was adopted by those who laid out the present occupation lines of Section 14, Section 55 and the Rice. It was also accepted by Mabry, the State Surveyor who did extensive work in the area during 1889, but most of Mabry's reports were excluded from the jury. At the time respondent instituted his suit, therefore, the following was the situation with respect to the various surveys as used on the ground: Section 55, Section 14, the Rice, Jones, Clarkson and two Wood Surveys had approximately their full east-west distance; (2) there was an east-west excess of about 300 varas in the Egbert; and (3) there was an east-west shortage of some 300 varas in the Gentry, small Fry, large Fry and Section 13.

The boundary dispute was resolved in respondent's favor by the jury's findings in response to Special Issues Nos. 1 and 2 that: (1) the northwest corner of the Clarkson Survey is at point "A" on the map; and (2) that the west lines of the Gentry and large Fry Surveys are the line "6 through 5 to 9" as shown on such map. We assume without deciding that there is evidence to support these findings.

The jury found against petitioners on the twenty-five year statute of limitation, but in response to Special Issues Nos. 3, 4 and 5 found in their favor under the three, five and ten year statutes. Since the jury also determined that the strip in question is located in the Gentry and Fry, the Court of Civil Appeals held that petitioners had failed to show title or color of title as required by the three year statute, Article 5507, Vernon's Ann.Tex.Civ.Stat., because it concluded that under the record there could be no overlapping of Section 55 into the Gentry and Fry. It also held that the payment of taxes on acreage rendered as part of Section 55 would not support a claim of title under the five year statute, Article 5509, Vernon's Ann.Tex.Civ.Stat., to land which, under the jury findings, is actually part of the Gentry and Fry. As we view the case, it is unnecessary for us to consider any of these questions.

Petitioners' claim under the ten year statute, Article 5510, Vernon's Ann.Tex. Civ.Stat., is based on possession and use of the property by three tenants. The first of these tenants was Beeler, who ran cattle on the land from 1918 until some time in 1935. There is a break in the possession between Beeler and the next tenant, Holt. Beeler left the land in 1935, and Holt went into possession in the Spring of 1938. Paddock used the property during part or all of the intervening three years, but it does not appear that he was then holding through and under H. T. Williamson. The Court of Civil Appeals concluded that there is a "floating" break of one year in petitioners' adverse possession through Beeler, and that Holt's possession cannot be tacked to that of Beeler. Both Beeler and Holt used the land for grazing livestock, and respondent contends that the enclosure within which they had possession was merely incidental and therefore that their possession was not adverse within the meaning of the limitation statutes. We do not attempt to decide any of these questions but begin with Paddock when he again moved his cattle

into the pasture after Holt vacated the premises.

Holt leased Section 55 from H. T. Williamson for the period from 1938 through 1942. He left on January 1, 1942, and Paddock began using the premises on April 13, 1942. Subject to two contentions urged by respondent in support of the trial court's action in disregarding the jury's finding in response to Special Issue No. 5, there is evidence to support the conclusion that H. T. Williamson and Mrs. Anderson, through their tenants, held peaceable and adverse possession of the land in question for a period of a little over ten years beginning with Paddock's entry in 1942.

Paddock obtained his first lease from Williamson on January 14, 1943, but petitioners offered the testimony of Paddock's foreman, Atkins, to show that Paddock was holding under Williamson during 1942. Atkins testified that his employer instructed him to begin using the Williamson pasture. According to the witness, Paddock also stated that it was his pasture, that he had subleased it from Holt for the remainder of 1942, and that after 1942 he would lease it directly from Williamson. The Court of Civil Appeals concluded that this testimony is hearsay and without probative force to show that Paddock was holding through and under Williamson during 1942. Paddock died prior to the trial, and petitioners contend that his statements are admissible as declarations against interest and also as verbal acts of a person in possession of land.

■ There are a number of cases holding that a statement by one in possession of land indicating that he held as the tenant of another is admissible as a declaration against interest. The courts there reasoned that since possession is prima facie evidence of fee title, a declaration that the possessor had only the rights of a tenant was against his interest in that it lessened the quantity of the estate which the law would otherwise presume he had. See Peaceable v. Watson, 4 Taunt. 16, 128 Eng.

Rep. 232; Doe v. Green, Gow 225, 171 Eng.Rep. 893; Carne v. Nicoll, 1 Bing. N.C. 430, 131 Eng.Rep. 1183. This approach has been criticized by at least one eminent authority, who pointed out that the ordinary man would not know that his occupancy raised a presumption that he was the owner of the premises in fee simple. See Morgan, Declarations Against Interest in Texas, 10 Tex.Law Rev. 399. Be that as it may, Paddock's statement is not admissible as a declaration against interest even under the cases just cited, because he was not in possession of the land at the time.

Other courts hold that the declarations of an occupant of land that he was the tenant of another are admissible as part of the res gestae, accompanying the act of possession and explanatory of it, to prove under whom he held. See West v. Price's Heirs, 2 J. J. Marsh. (Ky.) 380, 381; Clements v. Wheeler, 62 Ga. 53; Brolaskey v. McClain, 61 Pa. 146; Richmond Cedar Works v. Foreman Blades Lumber Co., 4th Cir., 267 F. 363. The early Texas cases fall into this category, and we have found no recent decisions here or elsewhere dealing with the problem. See Harnage v. Berry, 43 Tex. 567; Hooper v. Hall, 30 Tex. 154; Wallace v. Wilcox, 27 Tex. 60. In Dunn v. Taylor, 102 Tex. 80, 113 S.W. 265, it was said that the declaration of an occupant of land is admissible "to show the relation of landlord and tenant," but no attempt was made to explain why that is so.

■ Legal writers generally agree that the term "res gestae" is so vague and imprecise in its meaning and has been used by the courts so indiscriminately that it should be abandoned entirely. There are various types of utterances that are said to be admissible as res gestae. For example, spontaneous declarations made under the stress of physical shock or nervous excitement are admitted as a true exception to the hearsay rule to prove the truth of the facts stated. Another type of utterance which courts have frequently referred to as res gestae is the so-called verbal act. Here the

declaration is not hearsay at all, because it is not offered to prove the truth of the facts asserted. It is received because the mere utterance of the words has legal significance without regard to whether they are true. See Wigmore on Evidence, 3rd ed. 1940, §§ 1745, 1766, 1767.

■ Declarations by an occupant of land are clearly admissible as verbal acts when offered solely for the purpose of what Professor Wigmore calls "coloring the occupation." Statements by one in possession importing a claim of title in himself are thus received "as verbal parts of his act of occupation, serving to give it an adverse color; while his declarations of disclaim, conceding another's title, are equally receivable as giving it the contrary color." Wigmore § 1778. The mere fact that the words were uttered, without regard to whether they are true, tends to show that the occupancy was or was not adverse.

■ Atkins' testimony that Paddock said he had subleased from Holt is not admissible, however, to prove that there was, in fact, a bilateral transaction in which Holt leased to Paddock. If offered or considered for that purpose, it clearly constitutes hearsay and does not fall within any sound exception to the hearsay rule. The courts have made little effort to rationalize their holding that the declarations of an occupant of land might be received to show under whom he held. This rule may have developed as a concession to the practical difficulty of obtaining proof of the facts in any other manner. It may be an unintentional perversion of the doctrine that admits declarations of the occupant for the purpose of coloring his possession. In any event the rule became firmly embedded in our Anglo-American jurisprudence many years ago, and has been accepted by almost every court in which the question has arisen. In deference to the Texas decisions cited above, therefore, we hold as a matter of substantive law that in a case such as this where title by prescription is in issue, the possession of land by an occupant who *professed*

to hold under another person will, in law, be the possession of the latter if the purported landlord claimed to own the property at the time and there is no evidence that the occupant was, in fact, holding through or under some third person. Apparently that is what Professor Wigmore meant when he said that "[s]uch declarations signify that the declarant's acts of occupation were done on behalf of his alleged landlord and such acts will therefore be acts of possession for the landlord, provided only that the latter adopted them, and his then claim of title would suffice as such an adoption." Wigmore § 1778. See also West v. Price's Heirs, supra. Once this conclusion is reached, it necessarily follows that Atkins' testimony is not hearsay but was admissible as proof of a relevant verbal act on the part of Paddock.

As indicated above, Paddock's first written lease from H. T. Williamson was dated January 14, 1943. It was for a term ending December 31, 1945, and the leased premises were described in the instrument as follows:

> "All of the certain tract or parcel of land lying and being situated in Harris County, Texas, and known and described as 609 acres out of Section 55, Block 3, H. & T. C. R. R. Co. Survey, Patent 360, Vol. 106, Certificate No. 28/2069."

There were written leases or written extensions of leases for each year of Paddock's possession thereafter, and in each instrument the land was described substantially as set out above. None of them suggest on their face that the lessor intended to lease any land beyond the limits of Section 55.

■ Under the jury's findings in response to Special Issues Nos. 1 and 2, the strip in controversy lies in the Gentry and Fry Surveys. Since it is not part of the property covered by the legal description in the leases, respondent insists that Paddock's possession could not inure to the benefit of Williamson. He cites Niendorff v. Wood,

Tex.Civ.App., 149 S.W.2d 161 (writ ref.); Williams v. Fuerstenberg, Com.App., 23 S.W.2d 305; Weems v. Hawkins, Tex.Civ. App., 278 S.W.2d 439 (writ ref. n. r. e.); and Brownlee v. Landers, Tex.Civ.App., 166 S.W.2d 734 (no writ). These cases recognize and apply the general rule that a landlord who claims under the statutes of limitation by virtue of the possession of a tenant is deemed to have possession only of the land which, as between him and the tenant, the latter had in lawful possession under the terms of the lease contract. See also West v. Price's Heirs, supra; Holmes v. Turners Falls Lumber Co., 150 Mass. 535, 23 N.E. 305, 6 L.R.A. 283; Deregibus v. Silberman Furniture Co., 121 Conn. 633, 186 A. 553, 105 A.L.R. 1183; Umhau v. Bazzuro, 76 U.S.App.D.C. 394, 133 F.2d 356.

In dealing with this question, our courts as well as those of other jurisdictions have said that adverse possession, to ripen into title, must be such as would expose the claimant to some liability for what was done by him or under his authority during the limitation period. This rather sweeping statement is not entirely accurate. In Cobb v. Robertson, 99 Tex. 138, 86 S.W. 746, 122 Am.St.Rep. 609, the land had been leased by J. M. Robertson to Willard and Sorelle, who transferred their interest in the unexpired lease to Logan. Robertson refused to assent to the assignment, but Logan entered into possession and paid rent to Sorelle, who paid it to Robertson. Robertson later conveyed to Cobb, and the latter asserted title under the ten year statute by virtue of Logan's possession. The following excerpt from the opinion is relevant here:

"It is contended that Logan never became the tenant of Robertson, and was therefore never the tenant of Cobb, because Robertson never consented to the assignment to Logan of Willard and Sorelle's lease. A contract of leasing or renting is not essential to the holding possession by one for another. If the tenant enter under the title of another, and hold by permission or at sufferance, he is estopped to deny such title, and the possession, in law, is that of the owner. The authorities to be cited abundantly show this. The nature of the arrangement by which the possession is taken or held is immaterial to such an inquiry as this. Willard and Sorelle held under lease from Robertson, and not only they, but all who entered under them, were subject to the estoppel, and became the tenants of the lessor and his vendees, and so continued as long as they were permitted to remain. Whatever may have been the other rights of the landlord and tenants as between themselves, the possession, while it was permitted to last, was that of the landlord."

The evidence in the cases upon which respondent relies showed no connection whatsoever between the lessor and his tenant with respect to the land in controversy. It did not even appear that the lessor had ever claimed to own the property, and there was nothing to suggest that the tenant's occupancy was under and by virtue of the lease. The situation here is quite different. W. I. Williamson held under a deed from J. F. Robinson dated September 3, 1907, in which the land conveyed was referred to as H. & T. C. Ry. Co. Survey No. 55 and was then described by metes and bounds. The metes and bounds description, which calls for monuments that can be found on the ground, covers the land identified on the map by the numbers 15 to 20, inclusive. It also calls for the northwest corner of the Rice, the northwest corner of the large Fry, and the west line of the Gentry to be in the line from 17 to 18. The deed thus purported to convey the property now in controversy as part of Section 55, and substantially the same description was used in the conveyance from the H. & T. C. Railway Co. to J. F. Robinson dated May 22, 1901.

The outside boundaries of the land described by metes and bounds in the Williamson deed have been fenced for many years, and the property enclosed by the fences has

been generally known as the Williamson pasture. Beeler testified that "we termed it the Williamson tract or Section 55 or Satsuma pasture." The evidence indicates that Beeler also held under written leases in which the leased premises were described as part of Section 55. In 1930 while he was in possession, a neighbor tore down part of the east fence. Beeler notified Williamson, and a justice court proceeding was instituted in Beeler's name for recovery of possession. The case proceeded to judgment, and the fence was then rebuilt. Several of the Paddock leases obligated the lessee "to maintain the fences around the above described tract," and there is also testimony that H. T. Williamson displayed a sign on the part of the pasture now in dispute advertising 609.9 acres for sale. The entire pasture was used by tenants of W. I. Williamson, H. T. Williamson, and Mrs. Anderson for almost all of the thirty-five years preceding the institution of this suit.

■■ In our opinion the jury was entitled to conclude from the evidence that Mrs. Anderson, her predecessors in title and each of their tenants thought that Section 55 was the land enclosed by the fences and generally known as the Williamson pasture and believed that such pasture was covered by the several leases. The Williamson and Niendorff cases are therefore not controlling. Where it appears that both parties understood that the right to occupy certain premises passed under the lease, the tenant's occupancy thereof will be treated as that of his lessor even though such premises were not covered by the legal description in the lease. Capps v. Merrifield, 227 Mich. 194, 198 N.W. 918. See also Abatiell v. Morse, 115 Vt. 254, 56 A.2d 464; Coggins v. Shilling, 30 N.J.Super. 26, 103 A.2d 171. We hold that the trial court should have rendered judgment for petitioners on the basis of the jury's answer to Special Issue No. 5.

■ Respondent had a number of crosspoints in the Court of Civil Appeals, and he calls them to our attention in his brief here.

Cross-Points Nos. 1 to 4, inclusive, are rendered immaterial by the conclusions expressed above. No reversible error is shown by Cross-Points Nos. 7 and 8, which present questions of law, and they are overruled. The remaining two cross-points assert, in effect, that the finding of the jury in response to Special Issue No. 5 is contrary to the overwhelming weight of the evidence. This question lies within the exclusive jurisdiction of the Court of Civil Appeals, and the cause must be remanded to that court in order that it may consider the same. If Cross-Points Nos. 5 and 6 are sustained by the intermediate court, it will remand the cause to the district court for a new trial. Counsel for petitioners has stated that the lease and option of Herman L. Sanders and Gelta Realty Corporation terminated after the filing of the application for writ of error, and that Mrs. Anderson has since prosecuted the appeal in her sole behalf. Assuming that a proper showing to that effect is made, the Court of Civil Appeals will, if it overrules respondent's Cross-Points Nos. 5 and 6, either render judgment for Mrs. Anderson or remand the cause to the district court with instructions to do so.

Petitioners' motion for rehearing is granted, and our former judgment in this cause is set aside. The judgments of the courts below are reversed, and the cause is remanded to the Court of Civil Appeals for further proceedings consistent with this opinion. Respondent will have fifteen days from this date within which to file a motion for rehearing.

SMITH, J., dissenting.

SMITH, Justice (dissenting).

I respectfully dissent. Although a thoroughly considered opinion has been heretofore delivered by this court sustaining the respondent upon every material question, this court now reverses itself on motion for rehearing to the extent of holding in favor of the petitioners on their claim that they had perfected title under the

Texas ten-year limitations statute, Article 5510, Vernon's Annotated Civil Statutes.

The present opinion recognizes that the respondent is the owner of the land in controversy and would be entitled to recover the same but for its conclusion that the hearsay testimony of Atkins, Paddock's foreman, bridges the gap in the possession between January, 1942, and January, 1943, the date of the lease contract between Williamson and Paddock. This court's former opinion, in which I concurred by written opinion, held:

> "In view of the 'floating' break of one year in Beeler's possession, the break of about three years between Beeler and Holt, and the break of slightly more than a year between Holt and Paddock, the trial court properly held as a matter of law that petitioners had failed to prove *any ten consecutive years of adverse possession.*" (Emphasis added.)

The Court still adheres to its original view that Petitioners cannot rely upon the possession of Beeler, but begins the claimants' ten-year possession with the Holt possession and the Paddock possession "when he [Paddock] moved his cattle into the pasture after Holt vacated."

It is my position that the Atkins' testimony does not fill in the break between Holt and Paddock referred to in the Court's November, 1963, opinion. The Court neglects to note that Paddock had grazed his cattle on the land during the interim between the possession of Beeler and that of Holt. There is no evidence of privity of possession. The attribute of peaceable and adverse possession which is held by "different persons successively" is that "there must be privity of estate between them." Atkins testified that after Beeler left "we started using, Paddock Ranch started using that." "At that time LH 7 Ranch, Mark and Paddock used it." When Atkins was asked if "the Paddocks move(d) in shortly after he (Beeler) left?" Atkins said "he didn't remember how long," "not very long" and Atkins said further "Paddock used it

between Beeler and Holt." The land was fenced then. The fence would turn cattle. This is the extent of Atkins' testimony about the "adverse possession" of Williamson for the years 1936, 1937 and the early part of 1938. Holt left, and apparently gave up the premises, in January, 1942. Sometime before April 13, 1942, according to Atkins, Paddock instructed his foreman, Atkins, to begin using the Williamson pasture. Paddock also stated to the witness, Atkins, that it was his pasture after January 10, 1942; that he, Paddock, had subleased from Holt for the remainder of that year, and that after 1942 he would lease it from Williamson. This is not evidence of a tenancy relationship between Williamson and Paddock. This testimony fails to establish that the Petitioners have discharged their burden of showing affirmatively the facts with reference to their use of the land during the year, 1942. See Bowles v. Watson, Tex.Civ.App., 245 S.W. 120, 121, no wr. hist.; Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24 (1890); Orsborn v. Deep Rock, 153 Tex. 281, 267 S.W.2d 781 (1954); Moore v. Wooten, Tex. Com.App., 280 S.W. 742 (1926); Id., Tex. Com.App., 283 S.W. 153; Urschel v. Garcia, Tex.Civ.App., 164 S.W.2d 804 (1942), er. ref., w. o. m. This last case was cited with approval by this court in the Orsborn v. Deep Rock case.

Aside from the danger of allowing a witness to testify as to what his deceased former employer said, Atkins' testimony is not sufficient to support the Williamson claim of limitation by exclusive and adverse possession. The Urschel case reveals that it was a case such as we have here where the claimant's witness testimony was a pure conclusion of law, and amounted to no evidence of any of the facts of possession. In the Urschel case, the Court said in part:

> "In the first place, some gaps in appellee's possession were sought to be bridged by appellee's statement that he, or others for him, 'took possession,' 'went into possession,' 'was in possession,' and the like. Those statements

90

920

were pure conclusions of law on the part of the plaintiff-witness, and constituted no evidence of possession. 2 Tex.Jur. p. 74, § 38.

"Other gaps in possession were sought to be filled by appellee by testifying that between occupation by lessees he 'had a man' there in the pasture to 'keep up the fences' around the enclosure. There was no evidence that appellee was cultivating or otherwise actually using the land in the enclosure. It is well settled that the mere maintenance of fences around or other improvements on land, unaccompanied by actual occupancy or open use, does not constitute such adverse possession as will support a claim of title by limitation; a constructive possession alone is not sufficient. 2 Tex.Jur. p. 82, § 43; Niday v. Cochran, 42 Tex.Civ.App. 292, 93 S.W.1027, writ refused.

\* \* \* \* \* \*

"We are of the opinion that this testimony, consisting almost entirely of conclusions of law and generalities of fact, falls far short of that clear and satisfactory proof essential to a showing of such peaceful, adverse, exclusive and continuous possession and use of land as will support a limitation title under the statute. Art. 5510, R.S.1925; 2 Tex.Jur. p. 74, § 38, p. 82, § 43; Moore v. Wooten, Tex.Com.App., 280 S.W. 742; Id., Tex.Com.App., 283 S.W. 153; Murphy v. Welder, 58 Tex. 235; West Production Co. v. Kahanek, 132 Tex. 153, 121 S.W.2d 328; Gibbs v. Corbett, Tex.Civ.App., 292 S.W. 260; Niday v. Cochran, 42 Tex.Civ.App. 292, 93 S.W. 1027. \* \* \*"

There is no competent evidence that *Paddock held under Williamson prior to 1943.*

Furthermore, I am of the opinion that the possession of tenants, extending beyond the terms of the written tenant leases, does not inure to the benefit of the Williamsons.

Petitioners cannot recover under the ten-year statute of limitations even though it was established by the evidence that the possession of the tenants Beeler, Holt and Paddock was for a continuous ten-year period. This for the reason that these tenants went into possession under a written lease agreement which does not describe or include the land in controversy. The testimony shows that possession throughout was no different in character than when it began.

When an owner of land claims under the statutes of limitation by virtue of the possession of a tenant (the situation here) he is deemed to have possession only of that land of which, as between him and his tenant, the latter has lawful possession under the terms of the lease contract. In this case, the Beeler lease for the year 1934, specifically described only Section 55, the exact description being:

"All that certain tract or parcel of land lying and being situated in Harris County, Texas, and known and described as 605.086 acres out of Section 55, Block 3, H. & T. C. R. R. Co. Survey, Patent 360, Volume 106, Certificate No. 28/2069."

Although only one lease was introduced, it is clear from Beeler's testimony that he held the land under a written lease. I conclude that his occupancy of the land each and every year was by virtue of the written lease agreement. The tenants in this case held under restrictive leases. Possession of these tenants of the land in controversy, extending as it did beyond the terms of the written leases, did not inure to the benefit of the Williamsons. See 1 Tex.Jur. Ten Year Supp., p. 178, Adverse Possession, Sec. 41a; Williams v. Fuerstenberg, Tex.Com.App., 23 S.W.2d 305; Niendorff v. Wood, Tex.Civ.App., 149 S.W.2d 161, wr. ref.; Brownlee v. Landers, Tex. Civ.App., 166 S.W.2d 734.